ANGELINA HERNÁNDEZ RIVERA, demandante y apelante, *v.* GOBIERNO DE LA CAPITAL, demandado y apelado.

Número 11344.

*Sometido:* 18 de mayo de 1958. *Resuelto:* 30 de junio de 1960.

*César Andréu Ribas,* abogado de la apelante; *Luis Blanco Lugo y Alberto Picó,* abogados del apelado.

EL JUEZ ASOCIADO SEÑOR SERRANO GEYLS emitió la opinión del Tribunal.

No hay discusión sobre los hechos en este pleito de daños y perjuicios. Ordenados de manera cronológica son los siguientes:

La niña Marta Iris Hernández Rivera, de tres años de edad, fue recluida en el Hospital de la Capital, una institución de beneficencia pública, el día 25 de abril de 1951. Padecía de una enfermedad que más tarde se comprobó era meningitis. Se le colocó en el pabellón de niños bajo la atención del Dr. José E. Sifontes, médico del Hospital. El pabellón constaba de dos salas, una de dieciséis y otra de nueve camas. La enfermera graduada Helen Gutiérrez de Soto tenía a su cargo ambas salas con la ayuda de la enfermera auxiliar Dolores Dones. Los deberes principales de la enfermera auxiliar eran los de limpiar y cambiarle la ropa a los niños y de prepararles y darles las comidas. Cuando no estaba ocupada en estos asuntos vigilaba la sala más pequeña.

Marta Iris fue sometida desde su ingreso a un tratamiento de cloromicetina, luminal y suero, modificándose las cantidades de estos medicamentos de acuerdo con el estado de la paciente. Estuvo grave los primeros días, pero desde el 1 de mayo había pasado el peligro inmediato de muerte, aunque no se encontraba completamente bien. Su temperatura había fluctuado diariamente y el día 3 tuvo una lectura de 100°F. a las 8: a. m. y de 99° a las 4 p. m. La temperatura normal es de 98.6°F. También había fluctuado el ritmo del pulso y de la respiración, pero ya el día 3 estaba cerca de lo normal. Se le inyectaba luminal cuando estaba en estado de hipertensión, si un médico así lo autorizaba. Los días 30 de abril y 1 de mayo no se le dio luminal pero se le volvió a dar el día 2 por la noche "para calmarla" porque "gritaba mucho y estaba muy inquieta". Esa misma noche la niña le había "hecho

pasar un susto" a la enfermera, señora Soto, al tratar de subirse por un biombo que separaba su cama de la de los otros pacientes. La enfermera la vio y la bajó del biombo y fue después de este incidente que por órdenes de uno de los médicos se le inyectó el luminal.

El 3 de mayo por la noche, la señora Soto tenía a su cargo veintitrés pacientes, "grandes y bebés", catorce en la sala donde estaba Marta Iris y nueve en la otra. Entre ellos había por lo menos cuatro en estado de gravedad: uno de encefalitis, (¹) otro de meningitis tuberculosa, otro recién operado al cual se le suministraba suero y había que vigilarlo para quitárselo, y otro "bien grave" que requería aplicaciones de calor externo. Marta Iris ocupaba una cuna que era la cuarta o quinta hacia el centro de la sala, entrando por la derecha. La cuna, como todas las demás del Hospital, tenía barandas pero no tenía tapa de clase alguna. La niña vestía una camisita que tenía un cordoncito en la parte superior, alrededor del cuello. Esa era la vestimenta usual de los niños enfermos.

Durante la tarde de ese día 3, Marta Iris estuvo inquieta, lloraba y se quejaba. Su intranquilidad fue mayor después de las ocho de la noche. Poco después—no hay constancia de la hora exacta—en vista de que la niña estaba gritando e intranquila, la señora Soto le amarró las manos y los pies, en forma de cruz, de las barandas de la cuna. Esto, sin embargo, alteró más a la paciente y la enfermera la desamarró como dos minutos después. Entonces la niña "se viró boca abajo y se quedó aparentemente tranquila" pero no dormida. "Los niños cuando nosotros los amarramos le cogen miedo a que los amarren y se quedan aparentemente quietos porque le cogen miedo para que no los amarren otra vez." Era costumbre en el Hospital amarrar a los niños intranquilos y las enfermeras no necesitaban el permiso de un médico para ello.

Tan pronto la niña se tranquilizó, la enfermera le subió la baranda de la cuna, apagó la luz de la sala y se trasladó a

---

(¹) Esta paciente "había que vigilarla" pero su cuna quedaba al lado del escritorio de la enfermera.

la otra contigua. (²) Las salas estaban separadas por un cristal transparente. Desde el sitio en que se hallaba, la enfermera podía ver "en general a todos los niños" pero no "directamente" a Marta Iris. Además, no miró por el cristal porque estaba cambiándole el suero a un niño grave recién operado. Durante todo ese tiempo la enfermera auxiliar se encontraba fuera de las dos salas, preparando los biberones de los niños en una cocina aparte.

Como cinco minutos después de haber dejado a Marta Iris, la enfermera fue avisada por el Dr. Sifontes. Se trasladó junto a éste al sitio donde estaba la cuna de la niña y la encontró muerta, colgando del cordoncito de su camisa. Éste se había enganchado de un tornillito de un lado de la cuna cuando aparentemente la niña había tratado de bajarse. La muerte fue causada por "asfixia o desnucamiento".

El Dr. Sifontes estaba haciendo una de sus varias rondas nocturnas para examinar a los pacientes. Usaba una lámpara eléctrica de bolsillo (*flashlight*) para alumbrar las cuñas porque la luz del escritorio no era suficiente para "notar . . . las cosas más refinadas que entran en la observación de un paciente". En esa ronda y a las 8:45 p. m. encontró a Marta Iris en la posición ya descrita. A su juicio, la niña había muerto hacía cinco o diez minutos porque su temperatura era normal y no había rigidez en el cadáver. Luego de comprobar el hecho de la muerte, le avisó inmediatamente a la enfermera.

La madre y la abuela de la niña en varias ocasiones se ofrecieron para cuidar la paciente de día o de noche y se les rechazó diciéndoles que "allí había enfermeras de más" y que no había riesgo de clase alguna para la niña. Se estipuló por las partes que el Reglamento del Hospital prohibía que personas ajenas al personal cuidaran de los pacientes.

El juez sentenciador declaró sin lugar la demanda porque

(²) En una esquina de la sala había un escritorio para la enfermera. Tenía una pequeña lámpara con una pantalla que alumbraba principalmente el escritorio, pero que permitía ver toda la sala. Esa lámpara se quedó encendida al ausentarse la enfermera de la sala.

a su juicio se trataba de "un accidente lamentable y desgraciado del cual no puede imputarse responsabilidad alguna a la parte demandada". Añadió que "en este caso la prueba no indica negligencia alguna de parte de la demandada." El apelante adopta la posición opuesta.

■ Procede de inmediato disponer de varias cuestiones que no requieren discusión. En primer lugar, es sabido que por ley y jurisprudencia el Gobierno de la Capital responde de los actos negligentes de sus empleados y funcionarios realizados en el desempeño de sus deberes. [3] Esa responsabilidad no sufre alteración alguna cuando los actos negligentes se cometen al prestarse un servicio, que como en el presente caso, se ofrece gratuitamente. [4] Así lo admite el demandado. En segundo término, no se imputa al Gobierno de la Capital ni al Director del Hospital negligencia alguna en la selección de los empleados y funcionarios que actuaron en este asunto. Las partes así lo estipularon expresamente. Finalmente, no se alegó en el pleito ni se ofreció prueba alguna sobre negligencia de los actores en el desempeño de sus funciones puramente profesionales. No tenemos, por consiguiente, que enfrentarnos al espinoso problema, que tanto ha dividido la jurisprudencia norteamericana, de cuál es el alcance de la responsabilidad de un hospital público o privado por las actuaciones de sus empleados y funcionarios, y de otras personas que ejercen dentro de su recinto, realizadas estrictamente en el ámbito de su competencia profesional. [5]

---

[3] Art. 46 de la Ley núm. 99 de 15 de mayo de 1931 (*Leyes*, pág. 627, 21 L.P.R.A. sec. 561); *Serra* v. *Autoridad de Transporte*, 67 D.P.R. 611, 618-619 (1947); *Rodríguez* v. *Pueblo*, 75 D.P.R. 401, 412 (1953).

[4] *Serra* v. *Autoridad de Transporte*, supra, pág. 619; *Carrasquillo* v. *American Missionary Association*, 61 D.P.R. 867, 879 (1943).

[5] Se ha dicho que un acto pertenece al ámbito de la práctica de la medicina cuando tiene que ver con una de tres cosas: "Primero, juzgar la naturaleza, carácter o síntomas de la enfermedad; segundo, seleccionar los remedios adecuados para la enfermedad, tercero, realizar o prescribir la aplicación del remedio a la enfermedad." *Underwood* v. *Scott*, 23 Pac. 942, 943 (Ka. 1890). Véase el citado caso de *Carrasquillo*, en el cual se ordenó pagar compensación por daños tanto al hospital como al médico interno que atendió al paciente.

 Los hechos que hemos reseñado plantean única-
mente la cuestión de si el demandado Gobierno de la Capital,
actuando a través de algunos de los empleados y funcionarios
del Hospital, fue negligente al no ofrecer a la niña Marta
Iris Hernández Rivera la vigilancia, protección y cuidado ne-
cesarios. Se trata, en síntesis, de una alegada negligencia
en el desempeño de deberes que la jurisprudencia norteameri-
cana clasifica como "administrativos" o "ministeriales", y que
pueden definirse sucintamente como aquéllos de índole ruti-
naria relacionados "con el cuidado, la protección y la hospi-
talización corriente" del enfermo. *Fowler* v. *Norways Sani-
torium*, 42 N.E.2d 415, 419 (Ind. 1942); *Stuart Circle
Hospital Corp.* v. *Curry*, 3 S.E.2d 153, 157–159 (Va. 1939);
*St. Lukes Hospital Ass'n* v. *Long*, 240 P.2d 917, 921 (Col.
1952); *Capasso* v. *Square Sanitarium*, 155 N.Y.S.2d 313,
316–317 (1956).

Son sencillas y pueden explicarse brevemente las normas
que gobiernan la descrita responsabilidad.(6) Como sucede
con tanta frecuencia en el campo de los actos torticeros, es
en la aplicación de las normas generales a los hechos espe-
cíficos que se tropieza con dificultades.

Un hospital público o privado no es un asegurador de sus
pacientes contra todo daño que éstos puedan infligirse o que
les causen otras personas. El principio de responsabilidad
sin causa, no importa lo socialmente útil que pueda parecer,
no está autorizado por nuestras leyes en esta actividad. El
hospital sí responde por aquellos daños causados por actos
de comisión u omisión realizados por sus empleados y fun-
cionarios y comprendidos en el ámbito de sus funciones. El

---

(6)Véanse en general: Harbison, *The Standard of Care Owed by a
Hospital to Its Patients*, 2 Vand. L. Rev. 660 (1949); Danko y Matthews,
*Liability for Non Attendance of Patient*, 26 Notre Dame Law. 314 (1951);
Monografías en 22 A.L.R. 341 (1923), 39 A.L.R. 1431 (1925), 124 A.L.R.
186 (1940), 31 A.L.R.2d 1118, 1128 (1953); Hayt, Hayt y Groeschel, *Law
of Hospital, Physician and Patient*, 198–209 (1952); *Rice* v. *California
Lutheran Hospital*, 163 P.2d 860, 862 (Cal. 1945); *Lexington Hospital,
Inc.* v. *White*, 245 S.W.2d 927, 929–930 (Ky. 1952.)

▮▮▮▮▮▮▮▮▮▮▮▮

hospital tiene el deber de ofrecer al paciente el cuidado y la atención razonables que las circunstancias exigen, y éstos se miden por normas de razonabilidad y prudencia. Las prácticas prevalecientes en la comunidad pueden servir de índice. (⁷) Resultan decisivas en cada caso las condiciones y conducta específicas del paciente, su capacidad para cuidar de sí mismo, la información que realmente tenga el hospital sobre esas condiciones y esa conducta y capacidad y la que debe obtener si usa debidamente de la habilidad y experiencia de sus profesionales para constatarlas, y los peligros que existan en los alrededores. El deber de previsión no se extiende a todo peligro imaginable que concebiblemente pueda amenazar la seguridad del paciente sino a aquel que es probable que suceda y que llevaría a una persona prudente a anticiparlo. (⁸) En suma, la mítica pero indispensable figura del "hombre prudente y razonable" (⁹) define la norma de conducta, y el hospital será responsable si ocurre un daño que en las particulares circunstancias del caso pudo razonablemente haberse previsto y evitado.

▮▮ Por las circunstancias de este caso, es necesario darle mayor concreción a uno de los factores ya señalados. Las normas de atención y cuidado son de mayor exigencia cuando el paciente acusa una anormalidad física o mental que le impide o le hace difícil cuidar de sí mismo. En tales ocasiones, dependiendo de las circunstancias específicas, puede exigirse al hospital la adopción de medidas precautorias adicionales a las ordinarias y que pueden llegar hasta la vigilancia continua e ininterrumpida del paciente. Ejemplos son

---

(⁷) En este caso las partes no ofrecieron prueba alguna sobre esas prácticas. Sin embargo, consideradas las circunstancias concurrentes, esa prueba es conveniente pero no indispensable. *Stallman* v. *Robinson*, 260 S.W.2d 743, 749 (Mo. 1953); *McDonald* v. *Foster Memorial Hospital*, 338 P.2d 607, 616–617 (Cal. 1959).

(⁸) Sobre la norma de previsión véase en general, 2 Harper y James, *The Law of Torts*, 1134–1151 (1956).

(⁹) Seavey, *Negligence, Objective or Subjective?*, 41 Harv. L. Rev. 1 (1927); Prosser, *The Law of Torts*, 124–146 (1955).

los casos de enfermos con diversas manifestaciones de desórdenes o deficiencias mentales, (¹⁰) o delirantes, (¹¹) o epilépticos (¹²) o en estado de inconsciencia total o parcial causado por el uso de drogas o anestésicos, (¹³) etc. Asimismo, las normas de mayor exigencia rigen la conducta del hospital cuando se trata de niños enfermos. (¹⁴) El cuidado y la atención deben ir en aumento según se reduce la edad del niño y deben acentuarse si a la incapacidad de los años se unen reacciones anormales causadas por la enfermedad.

Aplicadas las normas generales y específicas a las circunstancias particulares del presente caso, es nuestro criterio que el Hospital de la Capital faltó decididamente a su deber de proteger y cuidar de la paciente Marta Iris Hernández Rivera y que el daño causado pudo haberse razonablemente previsto y evitado.

Se trata en este caso de una niña de tres años, que aunque mejorada, estaba todavía enferma de meningitis, en estado febril y de gran inquietud, y, por todas estas razones, completamente imposibilitada de cuidar de sí misma. (¹⁵) El Hospital tenía conocimiento completo de su enfermedad y de su estado, y a la enfermera que la atendía al momento de ocurrir su muerte le constaba que la niña en por lo menos una ocasión había abandonado su cuna y se había subido encima de un biombo en una situación de grave peligro. Igualmente era de conocimiento de esa enfermera que la niña

---

(¹⁰) *Gaccione* v. *State*, 18 N.Y.S.2d 161, 165 (1940); *Burtman* v. *State*, 67 N.Y.S.2d 271, 273 (1947); *United States* v. *Gray*, 199 F.2d 239, 242, 243 (10 Cir. 1952); *Stallman* v. *Robinson*, supra, pág. 747; *Murray* v. *St. Mary's Hospital*, 113 N.Y.S.2d 104, 105 (1952).

(¹¹) *Tate* v. *McCall Hospital*, 196 S. E. 906, 908 (Ga. 1938); *Spivey* v. *St. Thomas Hospital*, 211 S.W.2d 450, 455 (Tenn. 1947).

(¹²) *Hogan* v. *Clarksburg Hospital Co.*, 59 S. E. 943, 945 (W. Va. 1907).

(¹³) *Thomas* v. *Seaside Memorial Hospital*, 183 P.2d 288, 293 (Cal. 1947); *Rice* v. *California Lutheran Hospital*, supra, págs. 863–864.

(¹⁴) *St. Lukes Hospital Ass'n* v. *Long*, supra, pág. 921; *Capasso* v. *Square Sanitarium*, supra, pág. 316; *Thomas* v. *Seaside Memorial Hospital*, supra, págs. 292–293; *Prosser*, ob. cit., págs. 127–128; *Irizarry* v. *Pueblo*, 75 D.P.R. 786, 792 (1954).

(¹⁵) *St. Lukes Hospital Ass'n* v. *Long*, supra, pág. 921.

había estado muy inquieta unos minutos antes del accidente, a tal extremo que ella consideró propio amarrarla de pies y manos a las barandas de la cuna. Sabía, además, que al desamarrarla la niña no se había dormido sino que estaba "aparentemente tranquila" y que de acuerdo con su experiencia los niños al ser desamarrados simulan ese estado de quietud "porque cogen miedo para que no los amarren otra vez."

¿Qué atenciones, protección y cuidado proveyó el hospital para una paciente de esas condiciones y conducta? La colocó en un pabellón donde había veintidós otros pacientes, todos niños, y entre ellos cuatro necesitados de vigilancia especial. Ese pabellón estaba a cargo de una enfermera graduada asistida por una enfermera auxiliar pero ésta, por la índole de sus deberes, pasaba parte de su tiempo fuera de las dos salas de que se componía el pabellón y al momento de ocurrir el accidente estaba fuera. Proveyó también el hospital un médico que hacía varias rondas durante la noche. La paciente ocupaba una cuna con barandas pero sin ninguna otra protección que le impidiera salirse de ella y la enfermera, aun conociendo su estado de gran inquietud y el "susto" de la noche anterior, no proveyó de alguna manera esa protección al dejarla sola. Al momento del accidente había solamente una pequeña luz de escritorio cubierta por una pantalla para alumbrar los catorce pacientes que había en la sala donde se encontraba Marta Iris. La enfermera se hallaba fuera de esa sala, atareada cambiándole el suero a uno de los pacientes graves, en una posición de la cual podía observar la sala contigua a través de un cristal, pero no directamente a Marta Iris. Como cuestión de hecho, no miró hacia Marta Iris mientras realizaba la antedicha labor.

Creemos que el Hospital pudo haber ofrecido a Marta Iris la protección y el cuidado que su condición requería mediante el uso de ciertas medidas sencillas y de costo mínimo. Así por ejemplo, pudo asignar una enfermera adicional en los momentos en que la auxiliar estaba fuera del

pabellón o cuando había varios pacientes que requerían vigilancia especial; agrupar a estos últimos de manera que al asistir a uno de ellos, la enfermera pudiera, a la vez, vigilar de cerca a los demás; y proveer cunas equipadas de tal manera que los niños inquietos no pudiesen abandonarlas. En cuanto a la enfermera, aun en las circunstancias de agobio en que se hallaba debido al número excesivo de pacientes que tenía a su cargo y a la gravedad de algunos de ellos, la experiencia común nos dice que pudo tomar medidas para impedir que en su ausencia Marta Iris saliera de la cuna; o esperar a que estuviera completamente dormida antes de dejarla; o esperar el regreso de la enfermera auxiliar o la ronda del médico y encargarles la vigilancia de la niña. No podemos escapar al convencimiento de que algunas de esas medidas por sí solas hubiesen hecho extremadamente improbable que el accidente ocurriese y que la combinación de varias de ellas lo hubiesen hecho imposible. Igualmente estamos convencidos que de que en las circunstancias específicas de este caso y que hemos descrito en detalle, el Hospital faltó a su deber de cuidar y proteger razonablemente a la paciente.

Se nos dice, sin embargo, que este fue un accidente "raro" (así fue clasificado por el médico y la enfermera) y que el Hospital no podía prever que ocurriera de la manera que ocurrió. Nos parece, en primer término, que no es tan raro que una niña de tres años y en estado febril y de gran inquietud, al tratar de salirse de una cuna con barandas (acto que en las circunstancias del caso sí era claramente previsible) se enrede en la camisita que viste o el cordón que lleva al cuello y se cause daño. No obstante, aun en la hipótesis de que se aceptara que el Hospital no podía prever la manera específica en que Marta Iris perdió la vida, eso no ayuda en nada a su causa. El requisito de previsión "no significa que debieron haberse previsto el peligro preciso o las consecuencias exactas que surgieron .... 'Cuando se concluye que un hombre pudo de manera general haber previsto consecuencias de cierta clase, no le salva decir que no pudo prever el

curso preciso o la total extensión de las consecuencias, de esa clase, que en realidad sucedieron'," 2 Harper y James, *ob. cit.*, 1147; Prosser, *ob. cit.*, 258–266; *Spivey* v. *St. Thomas Hospital*, supra, págs. 455–457; *Lexington Hospital* v. *White*, supra, págs. 930–931; *Munsey* v. *Webb*, 231 U. S. 150, 155–156 (1913). Aunque no hubiese podido anticipar exactamente que la niña iba a morir colgada por el cuello del cordoncito de su camisa, el Hospital sí tenía toda la información necesaria para prever que en el estado en que se hallaba, Marta Iris podía tratar de salirse de la cuna, como ya lo había hecho la noche anterior, y como resultado caerse de la cuna, o subirse al biombo, o caminar y caerse por una ventana o unas escaleras, o tocar instrumentos cortantes, o aparatos eléctricos del Hospital, etc. y estar sujeta a graves daños en todas estas ocasiones. Era su deber protegerla contra esos peligros y esa protección hubiese evitado el accidente que ocurrió y que era del mismo carácter general que los ya descritos.

Por las razones expuestas procede declarar al Gobierno de la Capital incurso en negligencia y fijar la compensación que debe pagarle a la demandante por la muerte de su hija y la pérdida de su compañía y afecto. Nos parece razonable, considerando todos los elementos del caso, una compensación de $15,000 más todas las costas del litigio y $1,500 de honorarios de abogado.

*Se revocará la sentencia recurrida y se dictará nueva sentencia de acuerdo con esta opinión.*

El Juez Asociado Sr. Belaval disintió.