José Lugo Pérez y José Luis Lugo Ortiz, demandantes y recurrentes, *v.* Santo Asilo de Damas y La Asociación de las Señoras Damas del Santo Asilo de Ponce y La Standard Accident Insurance Co., demandados y recurridos.

Número: 635     Resuelto: 11 de octubre de 1963

*Benjamín Ortiz, Julio Suárez Garriga* y *Leopoldo Tormes,* abogados de los recurrentes; *Rieckehoff & Vargas, Francisco Parra Toro* y *Waldemar del Valle,* abogados de los recurridos.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

El Juez Asociado Señor Ramírez Bages emitió la opinión del Tribunal.

Invocando la doctrina que establecimos en *Hernández* v. *La Capital,* 81 D.P.R. 1031 (1960), los recurrentes sostienen que los recurridos son responsables por la muerte de una paciente que se cayó de una cama en el hospital de la recurrida, Santo Asilo de Damas de Ponce. No tienen razón a la luz de los hechos del caso sobre los cuales no hay controversia y que pasamos a relacionar.

Allá para el 17 de septiembre de 1958, la señora Serafina Ortiz, de 67 años de edad, fue recluida en el referido hospital

por indicación de su médico privado, el Dr. Luis C. Clavell, oftalmólogo, con el fin de practicarle una operación de catarata que le restaba 90% de la visión del ojo derecho y 50% de la visión del izquierdo. No obstante la afección de la vista, ella podía caminar y moverse de un sitio a otro sin ayuda y hasta el mismo día de su ingreso al hospital estuvo atendiendo por sí sola un negocio de su propiedad en la Barriada Bélgica de Ponce. Dicho hospital no tiene médicos bajo contrato para que presten servicios a sus pacientes por cuenta de la institución. No existía relación contractual de clase alguna entre el Dr. Clavell y el referido hospital. Por otra parte, este último le cobra al paciente que ha de ser hospitalizado, al solicitar ingreso al mismo, una cantidad para cubrir los gastos de hospitalización, sala de operaciones y cualquier otro servicio que por indicación de su médico ha de prestarse a la persona a ser hospitalizada. En el caso de autos la cantidad depositada por la Sra. Ortiz por ese concepto fue de $90.00.

Al ingresar la Sra. Ortiz al hospital, el médico interno Dr. R. Martínez, le practicó a la Sra. Ortiz un examen médico general que no demostró anormalidad alguna que hiciera aconsejable un tratamiento o cuidado especial, por lo que se le consideró como una paciente de cuido general (*general nursing care*), y se le recluyó en la sala Santa Luisa en donde se encontraban recluidos otros seis pacientes de cuido general. Dicha sala quedaba en la planta baja del hospital bastante cerca de otra sala, San Vicente, siendo ambas atendidas la noche de los hechos por una enfermera. En ambas salas había un total de catorce pacientes, todos ellos de cuido general. Durante la noche no había luz directa en la sala Santa Luisa, pero la del *"nursing station"* se reflejaba en ella dándole cierto grado de claridad.

Por prescripción de su médico, el Dr. Clavell, y con el propósito de prepararla adecuadamente para la operación de la vista que había de practicársele al día siguiente, se le dio a la hora de acostarse a la Sra. Ortiz una dosis de grano

y medio de nembutal. Usado con suma frecuencia en los hospitales de Puerto Rico, este sedante se administra a las personas que han de ser sometidas a una intervención quirúrgica con el propósito de tranquilizarlas y facilitar su descanso durante la noche. En el presente caso produjo el efecto normal que se esperaba, sueño.

Por razones desconocidas, sin embargo, durante esa noche la Sra. Ortiz se cayó de la cama sufriendo un golpe en el cráneo que produjo una hemorragia cerebral, siendo ésta la causa directa de su muerte.

El Dr. Clavell declaró que no prescribió uso de barandillas en la cama de la Sra. Ortiz porque no lo consideró necesario, ya que ella estaba tranquila; que es una excepción rarísima prescribir barandillas en casos de catarata.

Estos hechos dieron base a la acción de daños y perjuicios traída por José Lugo Pérez y José Luis Lugo Ortiz, esposo e hijo de la Sra. Ortiz, respectivamente, contra el Santo Asilo de Damas y la Standard Accident Insurance Co., codemandados en el caso que nos ocupa.

Visto el caso en sus méritos ante el Tribunal Superior, éste no encontró al hospital incurso en negligencia y declaró sin lugar la demanda.

No conforme, y en apoyo de su contención de que el dictamen del tribunal de instancia era improcedente, señalan los recurrentes como error cometido por dicho tribunal el haber resuelto que no se había establecido negligencia del hospital en cuestión cuando de hecho quedó probado que la paciente murió como resultado de una caída causada por falta de vigilancia, protección y cuidado de parte de los funcionarios y empleados de dicho hospital.

En *Hernández*, supra, expusimos brevemente las normas que gobiernan la responsabilidad de los hospitales y al efecto dijimos:

"Un hospital público o privado no es un asegurador de sus pacientes contra todo daño que éstos puedan infligirse o que les

causen otras personas. El principio de responsabilidad sin causa, no importa lo socialmente útil que pueda parecer, no está autorizado por nuestras leyes en esta actividad. El hospital sí responde por aquellos daños causados por actos de comisión u omisión realizados por sus empleados y funcionarios y comprendidos en el ámbito de sus funciones. El hospital tiene el deber de ofrecer al paciente el cuidado y la atención razonables que las circunstancias exigen, y éstos se miden por normas de razonabilidad y prudencia. Las prácticas prevalecientes en la comunidad pueden servir de índice. Resultan decisivas en cada caso las condiciones y conducta específicas del paciente, su capacidad para cuidar de sí mismo, la información que realmente tenga el hospital sobre esas condiciones y esa conducta y capacidad y la que debe obtener si usa debidamente de la habilidad y experiencia de sus profesionales para constatarlas, y los peligros que existen en los alrededores. El deber de previsión no se extiende a todo peligro imaginable que concebiblemente pueda amenazar la seguridad del paciente sino a aquel que es probable que suceda y que llevaría a una persona prudente a anticiparlo. En suma, la mítica pero indispensable figura del 'hombre prudente y razonable' define la norma de conducta, y el hospital será responsable si ocurre un daño que en las particulares circunstancias del· caso pudo razonablemente haberse previsto y evitado.

Por las circunstancias de este caso, es necesario darle mayor concreción a uno de los factores ya señalados. Las normas de atención y cuidado son de mayor exigencia cuando el paciente acusa una anormalidad física o mental que le impide o le hace difícil cuidar de sí mismo. En tales ocasiones, dependiendo de las circunstancias específicas, puede exigirse al hospital la adopción de medidas precautorias adicionales a las ordinarias y que pueden llegar hasta la vigilancia continua e ininterrumpida del paciente. Ejemplos son los casos de enfermos con diversas manifestaciones de desórdenes o deficiencias mentales, o delirantes, o epilépticos o en estado de inconsciencia total o parcial causado por el uso de drogas o anestésicos, etc. Asimismo, las normas de mayor exigencia rigen la conducta del hospital cuando se trata de niños enfermos. El cuidado y la atención deben ir en aumento según se reduce la edad del niño y deben acentuarse si a la incapacidad de los años se unen reacciones anormales causadas por la enfermedad."

Arguyen los recurrentes que el dictamen en *Hernández* es aplicable ya que los hechos en el caso de autos son análogos, pues, si bien en aquél se trataba de una niña, en éste se trataba de una anciana con escasa visión; que tanto los niños como los ancianos requieren el mismo grado de protección. En *Hernández* a la niña se le había dado a tomar luminal y en éste la paciente ingirió nembutal, siendo ambas drogas idénticas en sus efectos. En *Hernández*, había una enfermera y una auxiliar a cargo de ambas salas mientras que en el caso de autos ambas salas estaban atendidas por una enfermera solamente. En aquél, las salas estaban contiguas; en éste separadas. En *Hernández*, la cama no era tan alta y estrecha como la cama en el de autos y dicha cama tenía barandillas que no se colocaron en la cama de la paciente en el caso que nos ocupa. Esta línea de argumentación no nos convence de la aplicabilidad del dictamen en *Hernández* al caso bajo consideración.

■ A nuestro juicio, los hechos en los dos casos son clara e indubitablemente distinguibles. En *Hernández*, se trataba de una menor de tres años de edad en estado de gravedad quien se encontraba en una de dos salas con 23 pacientes en total bajo el cuido de una enfermera. Además de esa menor había otros cuatro pacientes en estado de gravedad, los cuales, tanto la menor como los otros cuatro necesitaban de un cuidado especial que podía llegar a vigilancia continua o ininterrumpida de los mismos, sobre todo la menor que estaba muy intranquila e inquieta. Por el contrario, en el caso de autos, la Sra. Ortiz no había demostrado requerir cuidado especial en ningún momento. Su única posible anormalidad estaba circunscrita a la afección de su vista, aunque no necesitaba de persona alguna para moverse de un sitio a otro. Sólo podía calificarse como una paciente de cuido general y junto a otros trece pacientes de igual cuido había sido recluida en una de dos salas cercanas bajo la supervisión de una enfermera. Tanto en Estados Unidos como en Puerto Rico se considera que existe un

servicio adecuado de enfermeras cuando existe una proporción de una enfermera por cada 24 pacientes durante la noche.

■ En el caso ante nos, la paciente ni ningún miembro de su familia, ni su médico particular le llamó la atención a la enfermera ni a funcionario otro alguno del hospital recurrido sobre cualquier hecho o circunstancia conocidas por cualquiera de ellos que hiciere aconsejable que en el caso de dicha paciente se tomaran medidas de precaución fuera de lo corriente. Bajo tales circunstancias, el peso de la autoridad sostiene que el hospital no es negligente si la paciente cae de la cama y sufre daños. *Memorial Hospital* v. *Doring,* 106 So.2d 565 (Fla. 1958); *Cochran* v. *Harrison Memorial Hospital,* 254 P.2d 752 (Wash. 1953); *Grace* v. *Manhattan Eye, Ear & Throat Hospital,* 93 N.E.2d 926 (N.Y. 1950). Cf. *Guidetti* v. *Columbus Hospital,* 229 N.Y.S.2d 865 (1962); *Kletrovetz* v. *Grant Hospital,* 152 N.E.2d 149 (Ohio 1957).

La enfermera auxiliar en *Hernández* se justificaba ya que entre las dos salas había 23 niños, cuatro de ellos estaban enfermos de gravedad, mientras que en el caso de autos, y de acuerdo con reconocidas y aceptadas normas de hospitales, sólo se justificaba una enfermera para los 13 pacientes adultos recluidos en las dos salas, ya que ninguno de ellos estaba enfermo de cuidado. La separación de las dos salas en el hospital recurrido estaba dentro de las normas mínimas que prescribe el Servicio de Salud Pública Federal. La cama de donde se cayó la Sra. Ortiz era del diseño de hospital, usual y corriente.

En *Ortiz Fuentes* v. *Presbyterian Hospital,* 83 D.P.R. 308 (1961), el paciente de 64 años de edad había sido operado de catarata; al cuarto día después de la operación, como a eso de las 8:30 de la noche, el paciente dice que oyó una voz que lo mandaba a acostar y entonces se levantó, vio dos camas y se acostó, y al virarse se cayó por la ventana de la habitación al patio interior del hospital. Responsabilizamos al hospital en *Ortiz Fuentes* porque el récord demostró que el

paciente "estaba mentalmente confundido o desorientado y que sufría errores de percepción atribuibles a que estaba recién operado, prácticamente ciego del otro ojo y sordo. Aunque su condición no requería atención constante, necesitaba ayuda para comer, para acostarse y levantarse y para hacer sus necesidades fisiológicas" y toda esta situación era de conocimiento del hospital ya que las enfermeras que atendían al demandante lo hacían constar en el récord diario que llevaban. Es obvio del resumen de los hechos del caso ante nos que la condición de la Sra. Ortiz era completamente distinta, pues aún no había sido operada, podía atenderse por sí sola, y el hospital ni ninguno de sus funcionarios y empleados tenía conocimiento de situación alguna que requiriese prestarle atención particular a dicha paciente; por el contrario la Sra. Ortiz había sido ingresada como paciente de cuido general y estaba siendo atendida por su médico particular quien nunca dio instrucciones que requiriesen otra atención que la que corrientemente se presta a un paciente de cuido general que fue la prestada a la Sra. Ortiz hasta el momento de su caída.

*Por las razones indicadas, no debemos aplicar a este caso el dictamen de Hernández ni el de Ortiz Fuentes. Más bien debemos atenernos a lo resuelto en Ramos Orengo v. La Capital, 88 D.P.R. 315 (1963). Cf. Castro v. Municipio de Guánica, 87 D.P.R. 725 (1963); Pérez v. Municipio de Mayagüez, 87 D.P.R. 620 (1963); Sáez v. Municipio de Ponce, 84 D.P.R. 535 (1962). Debe confirmarse la sentencia.*