ANTONIA GONZÁLEZ Y OTROS, demandantes y recurridos, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO y MUNICIPIO DE YABUCOA, demandados y recurrente el último.

*Número:* R-72-187          *Resuelto:* 17 de septiembre de 1975

*Agraít, Otero & Oliveras,* abogados del recurrente Municipio de Yabucoa; *Delgado & Ortiz,* abogados de los recurridos.

El Juez Asociado Señor Rigau emitió la opinión del Tribunal.

Se trata de un caso de daños. La ilustrada Sala Sentenciadora declaró con lugar la demanda y condenó al Municipio de Yabucoa a pagar una sentencia que totaliza $75,600.00.

A petición del Municipio decidimos revisar. El recurrente hace cuatro señalamientos de error, pero a los fines de esta decisión, en vista de lo que vamos a resolver, basta que mencionemos dos de ellos. El segundo, que erró el tribunal al hacer responsable al municipio del deceso de Rafaela Cordero; y el tercero, que erró el tribunal al aplicar la doctrina de *res ipsa loquitur* contra el recurrente.

Luego de un estudio completo del caso—sentencia, alegatos, transcripción de evidencia, etc.—hemos llegado a la conclusión de que debemos revocar. Nos explicamos a continuación.

En la mañana del 5 de abril de 1968 Rafaela Cordero se presentó en el Hospital Municipal de Yabucoa quejándose de dolores abdominales. El Director Médico de dicho hospital, Dr. Miguel E. Martínez, la examinó y diagnosticó úlcera en el estómago e hipertensión arterial.

El facultativo ordenó que la paciente fuese ingresada en el hospital para observación y que se le suministrase el siguiente tratamiento: (1) Glucosa—500 cc. al 5%, intravenoso; (2) Belladenal—2 cucharaditas 4 veces al día; (3) Creamalin—1 cucharada después de las comidas; (4) Luminal (sedante barbitúrico) 1 tableta de 2 gr. 2 veces al día; (5) una inyección de Veperone (analgésico); (6) una inyección de Atropina 1/150 (antiespasmódico); (7) Serpasil, tabletas de 0.25 mg.

Las primeras dosis de ese tratamiento le fueron suministradas a la paciente a las 10:00 A.M. de dicho 5 de abril, por la enfermera Carmen Clara Rodríguez. A las 3:00 P.M. dicha enfermera fue relevada por la enfermera María Ana Cintrón. Entre esa hora y las 9:00 P.M. la enfermera Cintrón dio a la

paciente una segunda dosis de las siguientes medicinas: Belladenal, Creamalin, Luminal y Serpasil.

Alrededor de las 4:00 P.M. la enfermera Cintrón observó que la paciente sentía frío y que tenía fiebre (37.8 grados). A las 8:00 P.M. la fiebre había aumentado (39.5 grados). A las 6:00 P.M. visitaron a la paciente su hija, Justina Cordero, y el esposo de ésta. La paciente estaba febril.

A las once de la noche del mismo día 5 la enfermera Cintrón fue relevada por la enfermera Gilbert. A la 1:00 A.M. del día 6 de abril Gilbert suministró a la paciente una tercera dosis de Belladenal.

A las 7:00 A.M. del día 6 la enfermera Gilbert fue relevada por la enfermera Lydia E. Morales de Burgos. Alrededor de las 8:00 A.M. el Dr. Martínez vio a la paciente por segunda vez y ordenó que se le suministrase una segunda dosis de glucosa, otra segunda inyección de Atropina y una primera dosis de Gelusil (antiácido).

A las 9:00 A.M. la enfermera Burgos suministró a la paciente Atropina, Gelusil, una cuarta dosis de Belladenal, una tercera dosis de Creamalin, una tercera dosis de Luminal y una tercera dosis de Serpasil.

Alrededor de las 10:30 A.M. del mismo día 6 Carmen, hija de 17 años de edad de la paciente, fue al hospital a verla. En ese momento la paciente estaba en el cuarto de baño y Carmen esperó que saliera. Carmen ayudó a su madre a acostarse y le dio a tomar un chocolate que le trajo en un termo. Mientras conversaban la paciente comenzó a vomitar. En ese momento llegó Justina, otra hija de la paciente. Llamaron a la enfermera y ésta observó que la paciente estaba cianótica y que vomitaba.

La enfermera le suministró a la paciente oxígeno por la vía nasal y glucosa intravenosa. Observó que la paciente quedó inconsciente y que tenía el pulso débil. Salió a buscar un médico y encontró al Dr. Larios. Al regresar la enfermera

con el médico ya la paciente había muerto. Murió a las 11:00 A.M. del 6 de abril.

Veinticuatro horas después, el Dr. Bolívar Patiño practicó la autopsia del cadáver. El examen patológico no demostró trombosis, ni condición crónica o patológica del corazón, ni condición crónica de patología gástrica; el cuadro de la patología fue de intoxicación aguda.

El Dr. Patiño encontró en el estómago de la occisa abundante cantidad de una sustancia amarilloverdosa, cuya composición él no pudo precisar al momento de practicar la autopsia. Concluyó que la intoxicación fue producida por la "ingestión de una sustancia química, pendiente de estudio toxicológico." El doctor envió al Instituto de Medicina Legal del Centro Médico, para análisis toxicológico, 50 cc. de esa sustancia y 50 cc. de la sangre de la occisa.

El toxicólogo, Dr. Sydney Kaye, encontró que tanto la muestra de sangre, como la gástrica, contenían abundante cantidad de glutamida, droga que se vende con el nombre de "Doriden." [1]

Según la prueba, el Dr. Martínez no recetó Doriden a la occisa; en el hospital no había existencias de Doriden; dicha droga no había sido comprada para el hospital por el Municipio; y ninguna de las enfermeras suministró Doriden a la occisa. Tampoco hay prueba de que las hijas de la occisa le suministraran el Doriden. La administración del hospital permite visitas a pacientes durante ciertas horas de la mañana y de la noche y si alguien entra fuera de horas lo sacan.

■ Los dos errores antes mencionados se cometieron. La prueba demuestra que la paciente fue objeto de atención hos-

---

[1] Este producto es manufacturado y vendido con ese nombre por USV Pharmaceutical Corp. De acuerdo con el fabricante, Doriden produce sueño dentro de los 30 minutos de haberse ingerido y su efecto dura de 4 a 8 horas. A base de eso es posible que la ingestión tuviese lugar unos 30 minutos antes de la muerte. La concurrencia de otras sustancias en el estómago puede apresurar ese tiempo de asimilación, como el alcohol, por ejemplo.

pitalaria y médica; que no medió negligencia en su atención profesional y cuidado hospitalario; y que no es un caso de *res ipsa*. El comportamiento de la paciente fue el normal de un paciente que siente dolores. No hay indicios de comportamiento anormal o extraordinario alguno de parte suya que requiriese del hospital medidas extraordinarias de precaución. *Santiago* v. *Prof. Hospital, Inc.*, 97 D.P.R. 801 (1969); *Lugo Pérez* v. *Santo Asilo de Damas*, 89 D.P.R. 247 (1963); *Ramos Orengo* v. *La Capital*, 88 D.P.R. 315 (1963).

■ Nada hay en la prueba que demuestre que el médico o el hospital, o sus agentes, le suministrasen a la paciente una dosis mortal de Doriden o de cualquier otra droga. Como hemos dicho, todo indica que la atención prestada a la paciente fue adecuada y dentro de lo profesionalmente aceptable. Ni los hospitales ni los médicos son aseguradores absolutos de sus pacientes. A la luz de los hechos de este caso no podemos imponerle lo que equivale a una responsabilidad absoluta al demandado recurrente.

Reiteramos nuestra expresión en *Oliveros* v. *Abréu*, 101 D.P.R. 209 (1973), contenida en las págs. 226 y 227;

"1. ¿Cuál ha de ser, pues, la norma mínima de atención médica exigible legalmente en casos de mala práctica en Puerto Rico? Aquella que, reconociendo los modernos medios de comunicación y de enseñanza, establece que el nivel o calidad de esa atención debe ser la que llena las exigencias profesionales generalmente reconocidas por la profesión médica. Lo dicho en *Rivera* v. *Dunscombe*, 73 D.P.R. 819, a la pág. 838, en el sentido de que 'un médico solo viene obligado a dar a sus pacientes aquella atención médica que generalmente se emplea para casos similares por el resto de los médicos en la comunidad' queda revocado por ser incompatible con la norma que aquí adoptamos.

2. A tono con nuestro empeño de ser justos y razonables, encontramos necesario decir unas palabras sobre el margen de discreción profesional que debe tener y tiene el médico al diagnosticar y al tratar pacientes. Anteriormente nos hemos referido a la medicina como una 'ciencia-arte.' Lo hemos hecho adrede. La práctica de la medicina requiere, en el diagnóstico y

en el tratamiento, que el facultativo llegue a juicios y tome decisiones. Hay en ese proceso un inevitable elemento subjetivo. También, la relación de médico y paciente es, o debe ser, única para ambos. Un médico tiene más de un paciente; posiblemente atiende en un mismo día a más de un paciente que sufren una misma enfermedad, pero la relación con cada uno es única porque trata con seres humanos y no con máquinas. La constitución física de cada ser humano es distinta, como lo es su sicología y su idiosincracia.

Lo dicho demuestra, por un lado, la responsabilidad que asume el médico al diagnosticar y al tratar y, por otro, la necesidad de reconocer el elemento humano, subjetivo, no exacto, de su quehacer. Esa realidad nos lleva, a su vez, a reconocer que en el ejercicio de la medicina cabe el error de juicio honesto de parte del médico y aceptable por los tribunales."

También allí dijimos, a la pág. 226:

"Desde luego, al fijar la norma debemos y queremos ser justos y razonables. No vamos a exigir requisitos o condiciones que hagan imposible la práctica de la medicina en Puerto Rico o que hagan económicamente prohibitivos los servicios médicos. Por otro lado, tenemos que poner nuestro derecho jurisprudencial a la altura de los tiempos. No podemos sancionar como buenas prácticas y actitudes inaceptables mediante la repetición de frases de hace un siglo que ya no tienen vigencia en estos días."

*Se revocará la sentencia recurrida.*

El Juez Asociado Señor Martín no intervino.