ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL VI

| | | |
|---|---|---|
| **MIGUEL FIGUEROA LUGO y OTROS**<br><br>Apelantes<br><br>v.<br><br>**HOSPITAL ESPAÑOL AUXILIO MUTUO DE PUERTO RICO, INC. y OTROS**<br><br>Apelados | KLAN202500455 | **APELACION** procedente del Tribunal de Primera Instancia, Sala Superior de **San Juan**<br><br>Civil Núm.: **SJ2021CV07200**<br><br>Sobre: Daños y Perjuicios |

Panel integrado por su presidenta, la Jueza Ortiz Flores, la Jueza Aldebol Mora y la Jueza Boria Vizcarrondo.

Boria Vizcarrondo, Jueza Ponente.

### SENTENCIA

En San Juan, Puerto Rico, a 29 de julio de 2025.

Comparece ante nos el señor Miguel Figueroa Lugo (Sr. Figueroa Lugo), por sí y en representación de sus hijos menores de edad (en conjunto, parte apelante), mediante una *Apelación* en la que solicita que revoquemos una *Sentencia Parcial* emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan, (TPI) el 12 de marzo de 2025.[1] Por medio de dicho dictamen, el foro primario declaró Ha Lugar la solicitud de sentencia sumaria presentada el 23 de agosto de 2024 por el doctor Álvaro Bravo Martínez (Dr. Bravo Martínez), por sí y como representante de la Sociedad Legal de Gananciales; y el Puerto Rico Medical Defense Insurance Company como aseguradora de dicho doctor (en conjunto, parte apelada).[2] Consecuentemente, ordenó la desestimación y archivo de la demanda incoada en su contra.

Por su parte, el 20 de junio de 2025, la parte apelada radicó un *Alegato en Oposición a Apelación*.

---

[1] Apéndice del recurso de apelación, Anejo 1, págs. 1-42. Notificada y archivada en autos el 12 de marzo de 2025.
[2] *Íd.*, Anejo 6, págs. 82-136.

Por los fundamentos que pormenorizamos a continuación, confirmamos la *Sentencia Parcial* apelada.

**I.**

El caso de marras tiene su génesis el 1 de noviembre de 2021 cuando la parte apelante radicó una *Demanda* en contra de la parte apelada, el Hospital Español Auxilio Mutuo de Puerto Rico (Hospital Auxilio Mutuo), el doctor Gabriel J. Rivera Velázquez (Dr. Rivera Velázquez), MEDPRO y SIMED en concepto de daños y perjuicios por impericia médico-hospitalaria.[3] Sostuvo que, el 13 de octubre de 2020, la señora Valerie Santos Rosario (Sra. Santos Rosario), fallecida y esposa del Sr. Figueroa Lugo, fue admitida al Hospital Auxilio Mutuo con un diagnóstico de pancreatitis. Al día siguiente fue sometida a una pancreatectomía distal con esplenectomía, con el propósito de que le removieran un tumor pancreático.

La parte apelante expuso que, luego de ser dada de alta el 21 de octubre de 2020, el Sr. Figueroa Lugo tuvo que llevar a su esposa a la sala de emergencias del Hospital Auxilio Mutuo el 4 de noviembre de 2020 porque sentía dolor abdominal y había vomitado el día anterior. Adujo que el radiólogo Dr. Bravo Martínez concluyó de un CT Scan que la Sra. Santos Rosario tenía un absceso. Ante dicho diagnóstico, el internista consultó al Dr. Rivera Velázquez, radiólogo intervencional, para que le drenara a la Sra. Santos Rosario dicho absceso abdominal por medio de un catéter. Al Dr. Rivera Velázquez colocarle el catéter, la parte apelante sostuvo que este entró a la cavidad pleural que rodeaba el pulmón, y rompió el diafragma causando que el fluido pancreático infectado entrara al área torácica. La parte apelante arguyó que, en ningún momento, los demandados discutieron la posibilidad de que la Sra. Santos Rosario tuviese un pseudoquiste pancreático, a pesar de que la

---

[3] *Íd.*, Anejo 2, págs. 43-52.

descripción del CT Scan era compatible con ese diagnóstico y no con el de absceso abdominal.

La parte apelante también alegó que la Sra. Santos Rosario estuvo sangrando internamente desde el 16 al 19 de noviembre de 2020, cuando sufrió un arresto cardiopulmonar. Sostuvo que la Sra. Santos Rosario fue llevada de emergencia a la sala de operaciones el 20 de noviembre de 2020 para una laparoscopía ante una sospecha de hemorragia masiva intraabdominal, pero se percataron que el diafragma estaba perforado y al abrirlo, estaba lleno de sangre y coágulos. Arguyó que, en dicha intervención de emergencia, el hemotórax izquierdo fue evacuado, se le removió el tubo de drenaje y se le reparó el diafragma. Sin embargo, la parte apelante indicó que la Sra. Santos Rosario falleció el 24 de noviembre de 2020 con 42 años, luego de sufrir una muerte cerebral.

Ante todo lo anterior, la parte apelante reclamó $3,000,000.00 por la muerte de la Sra. Santos Rosario; $1,500,000.00 por los dolores físicos, fiebre, entre otros, padecidos por la Sra. Santos Rosario; una suma de $500,000.00 a causa del miedo, temor, angustia y tristeza que sufrió la Sra. Santos Rosario; $500,000.00 por el arresto cardiopulmonar de la Sra. Santos Rosario, entre otras complicaciones; $1,500,000.00 ante la pérdida de la Sra. Santos Rosario, madre de los menores y esposa del Sr. Figueroa Lugo; $500,000.00 en concepto de angustias mentales y emocionales de la parte apelante; y una suma de $1,000,000.00 en concepto de lucro cesante, toda vez que la Sra. Santos Rosario era la proveedora principal del hogar.

Luego de múltiples trámites procesales, la parte apelada radicó una *Contestación a Demanda* el 18 de enero de 2022.[4]

---

[4] *Íd.*, Anejo 3, págs. 53-61.

Admitió que el Dr. Bravo Martínez realizó una lectura de un CT el 13 de noviembre de 2020, y alegó afirmativamente que dicho doctor cumplió cabalmente con los estándares reconocidos en la profesión médica, y a base de la condición que padecía la Sra. Santos Rosario.

El 8 de noviembre de 2022, la parte apelante presentó una *Moción Solicitando Autorización para Enmendar Demanda*.[5] En lo pertinente, solicitó permiso para presentar una demanda enmendada a los efectos de sustituir como demandados desconocidos a la esposa del Dr. Bravo Martínez, la señora Rosela María Morato Rivera; y al Oncology & Body Imaging, PSC.

Después de varios trámites procesales, la parte apelada radicó una *Contestación a Demanda Enmendada* el 8 de febrero de 2023.[6]

El 23 de agosto de 2024, la parte apelada presentó una *Moción de Sentencia Sumaria por Falta de Relación Causal* en la que sostuvo que el Dr. Bravo Martínez nunca se convirtió en el *attending physician* o el médico a cargo de la paciente, sino que fungió como radiólogo diagnóstico.[7] Sostuvo que el hecho de que el Dr. Bravo Martínez no hubiese incluido el diagnóstico de pseudoquiste en su lectura de CT Scan fue inconsecuente, toda vez que dicha imagen fue escudriñada e interpretada nuevamente por el radiólogo intervencional, quien llegaba a su propia conclusión. Adujo también que el Dr. Bravo Martínez no tuvo inherencia sobre el tratamiento que otros doctores brindaron ni podía anticipar el tratamiento que otras personas ofrecieran posterior a su intervención. Igualmente, la parte apelada alegó que la lectura que realizó el Dr. Bravo Martínez sobre el CT Scan y que la misma no incluyera la posibilidad de un pseudoquiste no fue la causa próxima del daño reclamado. Por último, adujo que no existía causal entre el tratamiento

---

[5] *Íd.*, Anejo 4, págs. 62-71.
[6] *Íd.*, Anejo 5, págs. 72-81.
[7] *Íd.*, Anejo 6, págs. 82-136.

brindado por el Dr. Bravo Martínez y el fallecimiento de la Sra. Santos Rosario, 11 días después de la lectura realizada.

El 4 de octubre de 2024, la parte apelante radicó una *Oposición a Sentencia Sumaria por Falta de Relación Causal.*[8] Suplicó del foro primario denegar la petición de sentencia sumaria, pues adujo que estaba en controversia si el Dr. Bravo Martínez incurrió en negligencia al no haber mencionado en la lectura del CT Scan el diagnóstico de pseudoquiste pancreático, y si la prueba pericial de la parte apelante sustentaba las alegaciones de negligencia en contra del Dr. Bravo Martínez.

El 28 de octubre de 2024, la parte apelada presentó una *Réplica a Oposición a Sentencia Sumaria por Falta de Relación Causal* donde sostuvo que no existía relación o nexo causal alguno que justificara la continuación de la reclamación presentada en su contra.[9] Igualmente, arguyó que los peritos y el Dr. Rivera Velázquez coincidieron con el diagnóstico realizado por el Dr. Bravo Martínez; es decir, con la presencia de un absceso; y que el Dr. Rivera Velázquez utilizó su propio juicio clínico para decidir si era necesario hacer una intervención con la Sra. Santos Rosario.

Por su parte, la parte apelante radicó una *Dúplica a Oposición de Sentencia Sumaria por Falta de Relación Causal* el 8 de noviembre de 2024 en la que reiteró los mismos planteamientos de la oposición a la petición de solicitud de sentencia sumaria.[10]

El 12 de marzo de 2025, el foro primario emitió la *Sentencia Parcial* apelada por medio de la cual declaró Ha Lugar la solicitud de sentencia sumaria presentada por la parte apelada. Consecuentemente, ordenó la desestimación y archivo de la demanda incoada en su contra. Fundamentó su determinación en

---

[8] *Íd.*, Anejo 7, págs. 137-573.
[9] *Íd.*, Anejo 9, págs. 667-725.
[10] *Íd.*, Anejo 10, págs. 726-1051.

que el Dr. Bravo Martínez no se apartó de las normas de excelencia profesional reconocidas por la profesión médica, y que no existía un nexo causal entre el diagnóstico abdominal del Dr. Bravo Martínez y los daños sufridos por la Sra. Santos Rosario.

Inconforme, la parte apelante radicó una solicitud de reconsideración el 27 de marzo de 2025,[11] la cual fue denegada por el TPI el 21 de abril de 2025.[12]

Insatisfecha, la parte apelante presentó ante nos un recurso de apelación el 21 de mayo de 2025 y planteó los siguientes señalamientos de error:

> **ERRÓ EL TPI AL DICTAR SENTENCIA PARCIAL DESESTIMANDO LA DEMANDA EN CONTRA DEL DR. BRAVO AUN CUANDO EXISTEN CONTROVERSIAS DE HECHOS MATERIALES QUE IMPIDEN QUE SE DICTE LA MISMA.**
>
> **ERRÓ EL TPI AL NO RESOLVER LA MOCIÓN DE SENTENCIA SUMARIA A LA LUZ MÁS FAVORABLE DE LA PARTE QUE SE OPONE, ES DECIR, LA PARTE DEMANDANTE-APELANTE.**
>
> **ERRÓ EL TPI AL DIRIMIR LA CREDIBILIDAD DE LOS PERITOS DE LAS PARTES Y LOS MÉDICOS DEMANDADOS AL MOMENTO DE DETERMINAR LOS HECHOS QUE NO ESTÁN EN CONTROVERSIA Y LAS CONCLUSIONES DE DERECHO.**
>
> **EL TPI ERRÓ Y ACTUÓ CON PERJUICIO Y PARCIALIDAD AL DARLE MAYOR CREDIBILIDAD AL TESTIMONIO BAJO JURAMENTO EN DEPOSICIONES DE LOS PERITOS DE LOS DEMANDADOS Y LOS DEMANDADOS QUE AL PERITO DE LA PARTE DEMANDANTE.**
>
> **EL TPI ERRÓ Y ACTUÓ CON PREJUICIO Y PARCIALIDAD AL HACER DETERMINACIONES DE HECHOS QUE NO ESTÁN RELACIONADAS A LAS CONTROVERSIAS ESBOZADAS EN LA MOCIÓN DE SENTENCIA SUMARIA, SU OPOSICIÓN Y ESCRITOS POSTERIORES, EXCEDIÉNDOSE A SU VEZ DE SU DISCRECIÓN.**

Por su parte, el 20 de junio de 2025, la parte apelada radicó un *Alegato en Oposición a Apelación*. En síntesis, arguyó que la parte

---

[11] *Íd.*, Anejo 11, págs. 1052-1085; véase también, *Íd.*, Anejo 12, págs. 1086-1104.
[12] *Íd.*, Anejo 13, pág. 1105. La *Resolución* fue notificada y archivada en autos el 21 de abril de 2025.

apelante pretendió rotular como credibilidad lo que en realidad era insuficiencia probatoria, y que el foro primario reconoció que las admisiones del perito de la parte apelante destruyeron los elementos necesarios para la reclamación de marras. Sostuvo también que el foro primario no se extralimitó ni abordó asuntos irrelevantes; en cambio, que contextualizó los eventos clínicos posteriores a la intervención del Dr. Bravo Martínez con el propósito legítimo de establecer la inexistencia de nexo causal entre su actuación y el desenlace clínico. Además, alegó que, al considerar una solicitud de sentencia sumaria, los jueces y las juezas pueden y deben considerar todos los documentos en autos, sean o no parte de dicha petición y su oposición, de los cuales surjan las admisiones de las partes. Por último, adujo que el foro *a quo* resolvió conforme a la Regla 36 de Procedimiento Civil, *supra*, y jurisprudencia aplicable, y suplicó que confirmáramos la *Sentencia Parcial* apelada.

## II.

### A.

La Regla 36 de Procedimiento Civil, *supra*, R. 36, establece el mecanismo procesal de la sentencia sumaria. El propósito de esta regla es facilitar la solución justa, rápida y económica de litigios civiles en los cuales no existe controversia real y sustancial de hechos materiales y que no requieren ventilarse en un juicio plenario. *Rodríguez García v. UCA*, 200 DPR 929, 940 (2018); *Bobé et al. v. UBS Financial Services*, 198 DPR 6, 19-20 (2017); *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 430 (2013). Mediante este procedimiento, una parte puede solicitar que el tribunal dicte sentencia sumaria sobre la totalidad o parte de la reclamación, y así se promueve la descongestión de calendarios. *Vera v. Dr. Bravo*, 161 DPR 308, 331-332 (2004).

De igual modo, el mecanismo de sentencia sumaria solo está disponible para la disposición de aquellos casos que sean claros;

cuando el tribunal tenga ante sí la verdad de todos los hechos esenciales alegados en la demanda; y que solo reste por disponer las controversias de derecho existentes. *PFZ Props., Inc. v. Gen. Acc. Ins. Co.*, 136 DPR 881, 911-912 (1994). Asimismo, la Regla 36.3(e) de Procedimiento Civil, *supra*, R. Regla 36.3(e) dispone que:

> La sentencia solicitada será dictada inmediatamente si las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente y que, como cuestión de derecho, el tribunal debe dictar sentencia sumaria a favor de la parte promovente.

Al evaluarse los méritos de una solicitud de sentencia sumaria, el juzgador debe actuar guiado por la prudencia, consciente en todo momento de que su determinación puede privar a una de las partes de su día en corte. *León Torres v. Rivera Lebrón,* 204 DPR 20, 44 (2020). De la mano con este precepto del debido proceso de ley, el juzgador deberá utilizar el principio de liberalidad a favor del opositor de la moción, lo cual implica que, de haber dudas sobre la existencia de controversias de hechos materiales, entonces deberán resolverse a favor de la parte que se opone a la moción de sentencia sumaria. *Ramos Pérez v. Univisión*, 178 DPR 200, 216 (2010).

Además, nuestro máximo foro ha establecido que no es aconsejable dictar una sentencia sumaria cuando existe controversia sobre asuntos de credibilidad o que envuelvan aspectos subjetivos tales como la intención, los propósitos mentales o la negligencia. *Aponte Valentín v. Pfizer Pharmaceuticals, LLC*, 208 DPR 263, 278 (2021). Sin embargo, "nada impide que se utilice el mecanismo de sentencia sumaria en reclamaciones que requieran elementos subjetivos o de intención cuando surge de los documentos que se considerarán en la solicitud de sentencia sumaria la inexistencia de una controversia en torno a los hechos

materiales". *Cruz Cruz v. Casa Bella Corp.*, 213 DPR 980, 993-994 (2024).

Para prevalecer en una moción de sentencia sumaria, su promovente tiene que establecer su derecho con claridad y debe demostrar que no existe controversia en cuanto a ningún hecho material, o sea, ningún elemento de la causa de acción. *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 110 (2015). Por hechos materiales se entienden aquellos que pueden afectar el resultado de una reclamación de acuerdo con el derecho sustantivo. *Ramos Pérez v. Univisión, supra*, pág. 213. Además:

> [U]na controversia no es siempre real o sustancial, o genuina. La controversia debe ser de una calidad suficiente como para que sea necesario que un juez la dirima a través de un juicio plenario. La fórmula, debe ser, por lo tanto, que la moción de sentencia sumaria adecuadamente presentada sólo puede negarse si la parte que se opone a ella presenta una oposición basada en hechos que puedan mover a un juez a resolver a su favor. Si el juez se convence de que no existe una posibilidad razonable de que escuchar lo que lee no podrá conducirlo a una decisión a favor de esa parte, debe dictar sentencia sumaria. *Ramos Pérez v. Univisión, supra*, págs. 213-214 (*citando a* P. E. Ortiz Álvarez, *Hacia el uso óptimo de la sentencia sumaria*, 3 (Núm. 2) Forum 3, pág. 8 (1987)).

En suma, deberá demostrar que: (1) no es necesario celebrar una vista; (2) el demandante no cuenta con evidencia para probar algún hecho sustancial; y (3) procede como cuestión de derecho. R. Hernández Colón, *Práctica Jurídica de Puerto Rico: Derecho Procesal Civil*, 6ª ed. rev., San Juan, Ed. LexisNexis, 2017, pág. 317.

En contraste, el oponente a la moción de sentencia sumaria está obligado a establecer que existe una controversia que sea real en cuanto a algún hecho material a la controversia y, en ese sentido, no es cualquier duda es suficiente para derrotar la solicitud. *Meléndez González et al. v. M. Cuebas, supra*. En efecto, la duda debe ser tal que permita concluir que existe una controversia real y sustancial sobre los hechos materiales. *Meléndez González et al. v. M. Cuebas, supra* (*citando a Ramos Pérez v. Univisión, supra*, pág.

214). De esta manera, central entre las responsabilidades de la parte promovida se encuentra que debe puntualizar los hechos propuestos que pretende controvertir, haciendo referencia a la prueba específica que sostiene su posición. *León Torres v. Rivera Lebrón, supra*, pág. 44. Es decir, "la parte opositora tiene el peso de presentar evidencia sustancial que apoye los hechos materiales que alega están en disputa". *León Torres v. Rivera Lebrón, supra*, pág. 44. De esta forma, no puede descansar en meras aseveraciones o negaciones de sus alegaciones, sino que debe proveer contradeclaraciones juradas y documentos que sustenten los hechos materiales en disputa. *SLG Zapata-Rivera v. JF Montalvo, supra*; *Ramos Pérez v. Univisión, supra*, pág. 215; *Cruz Marcano v. Sánchez Tarazona*, 172 DPR 526, 550 (2007).

En esa misma línea, al evaluar una moción de sentencia sumaria, "los jueces no están limitados por los hechos o documentos que se aduzcan en la solicitud, sino que deben considerar todos los documentos en autos —sean o no parte de la solicitud de sentencia sumaria— de los cuales surjan admisiones hechas por las partes". *Mejías v. Carrasquillo*, 185 DPR 288, 300 (2012). De igual modo, al determinar si existen hechos en controversia que impiden dictar una sentencia sumariamente, "el tribunal debe analizar los documentos que acompañan la solicitud de sentencia sumaria y los documentos incluidos con la moción en oposición, así como los que obren en el expediente del tribunal". *Cruz Marcano v. Sánchez Tarazona, supra*, pág. 550. Solo procede dictar dicha sentencia "cuando surge claramente que el promovido no puede prevalecer y que el tribunal cuenta con la verdad de todos los hechos necesarios para poder resolver la controversia". *Const. José Carro v. Mun. Dorado*, 186 DPR 113, 129 (2012).

En pleitos sobre daños y perjuicios, la demandante puede presentar una petición de sentencia sumaria con posibilidades de

éxito si incluye prueba sobre todas las aseveraciones de la demanda que sean elementos indispensables de dicha reclamación; es decir, sobre la acción u omisión, la culpa o negligencia, y la relación causal con el daño. *Cuadrado Lugo v. Santiago Rodríguez*, 126 DPR 272, 281 (1990).

Entretanto, la Regla 36.3 de Procedimiento Civil, *supra*, establece el procedimiento para la consideración de la moción de sentencia sumaria, así como el contenido de la moción y de la contestación de la parte promovida. Respecto a la moción solicitando que se dicte una sentencia sumaria, la Regla 36.3(a) de Procedimiento Civil, *supra*, R. 36.3(a), dispone que tendrá que desglosar lo siguiente:

(1) una exposición breve de las alegaciones de las partes;
(2) los asuntos litigiosos o en controversia;
(3) la causa de acción, reclamación o parte respecto a la cual es solicitada la sentencia sumaria;
(4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal;
(5) las razones por las cuales debe ser dictada la sentencia, argumentando el derecho aplicable, y
(6) el remedio que debe ser concedido.

Por otra parte, la Regla 36.3(b) de Procedimiento Civil, *supra*, señala que la contestación a la moción de sentencia sumaria debe contener, además de los sub incisos (1), (2) y (3) del inciso (a); una relación de los hechos esenciales y pertinentes que están en controversia, con referencia a los párrafos enumerados por la parte promovente y con indicación de la prueba en la que se establecen esos hechos; una enumeración de los hechos que no están en controversia; y las razones por las cuales no se debe dictar la sentencia, argumentando el derecho aplicable.

De otra parte, en *Meléndez González et al. v. M. Cuebas, supra,* el Tribunal Supremo delineó el estándar que el Tribunal de Apelaciones debe utilizar para revisar una denegatoria o una concesión de una moción de sentencia sumaria.

En primer lugar, reafirmó que el Tribunal de Apelaciones se encuentra en la misma posición que el TPI al momento de revisar solicitudes de sentencia sumaria, siendo su revisión una *de novo* y teniendo la obligación de regirse por la Regla 36 de Procedimiento Civil, *supra*, R. 36, y los criterios que la jurisprudencia le exige al foro primario. *Meléndez González et al. v. M. Cuebas, supra*, pág. 118. Asimismo, deberá examinar el expediente de la manera más favorable hacia la parte que se opuso a la petición de sentencia sumaria, llevando a cabo todas las inferencias permisibles a su favor. Ahora bien, reconoció que el foro apelativo está limitado, toda vez que no podrá tomar en consideración evidencia que las partes no presentaron ante el foro primario, ni podrá adjudicar los hechos materiales en controversia.

En segundo lugar, prescribió que el Tribunal de Apelaciones deberá revisar que tanto la moción en solicitud de sentencia sumaria, como la oposición, cumplan con los requisitos de forma codificados en la Regla 36 de Procedimiento Civil, *supra*. *Meléndez González et al. v. M. Cuebas, supra*, pág. 118.

En tercer lugar, mandató que, ante la revisión de una sentencia dictada sumariamente, el Tribunal de Apelaciones deberá revisar si en realidad existen hechos materiales en controversia y, de haberlos, estará obligado a exponer específicamente cuáles hechos materiales están en controversia y cuáles no, en cumplimiento con la Regla 36.4 de Procedimiento Civil, *supra*, R. 36.4. *Meléndez González et al. v. M. Cuebas, supra,* pág. 118.

En cuarto lugar, dispuso que, si encuentra que los hechos materiales realmente no están en controversia, entonces el Tribunal

de Apelaciones deberá revisar *de novo* si el foro primario aplicó correctamente el Derecho. *Meléndez González et al. v. M. Cuebas*, *supra*, pág. 119.

**B.**

Es harto conocido que quien por acción u omisión le cause daño a otra persona, interviniendo culpa o negligencia, quedará obligado u obligada a reparar dicho daño. Artículo 1802 del *"Código Civil de Puerto Rico" Edición de 1930*, 31 LPRA ant. sec. 5141 (derogado) (Código Civil de 1930);[13] véase, además, *Cruz Flores v. Hospital Ryder Memorial, Inc.*, 210 DPR 465, 483-484 (2022). Para iniciar una causa de acción, a tenor con el Artículo 1802 del Código Civil de 1930, *supra*, ant. sec. 5141, la parte demandante deberá establecer tres (3) requisitos; a saber, (1) la existencia de un daño real; (2) el nexo causal entre el daño y la acción u omisión de la parte demandada; y (3) el que el acto u omisión sea culposo o negligente. *Cruz Flores v. Hospital Ryder Memorial, Inc.*, *supra*, págs. 483-484; *Pérez Hernández v. Lares Medical Center, Inc.*, 207 DPR 965, 976 (2021); *López v. Porrata Doria*, 169 DPR 135, 150 (2006).

La culpa o negligencia "consiste en la falta del debido cuidado, por no anticipar ni prever las consecuencias de un acto u *omisión*, que una persona prudente y razonable habría de prever en las mismas circunstancias". *Cruz Flores v. Hospital Ryder Memorial, Inc.*, *supra*, pág. 484 (Énfasis suplido en el original eliminado); *Pérez Hernández vc. Lares Medical Center, Inc.*, *supra*, pág. 976-977. Asimismo, la negligencia por omisión surge cuando no se anticipa ni evita la ocurrencia de daños que racionalmente pudieron preverse. *Cruz Flores v. Hospital Ryder Memorial, Inc.*, *supra*, pág.

---

[13] El alegado acto u omisión culposo del caso de marras- siendo este omitir el diagnóstico de un pseudoquiste de la lectura del CT- surgió el 13 de noviembre de 2020. Es decir, aconteció previo a que el *"Código Civil de Puerto Rico" de 2020*, Ley Núm. 55 del 1 de junio de 2020, según enmendado, 31 LPRA sec. 5322, entrara en vigor. Por ende, aplican al pleito de autos las disposiciones del derogado Código Civil de 1930, *supra*.

484; *López v. Porrata Doria, supra,* pág. 150; *Toro Aponte v. E.L.A.,* 142 DPR 464 (1997). Para determinar si una omisión, en efecto, genera responsabilidad se considerarán dos (2) requisitos; estos son, (1) la existencia o inexistencia de un deber jurídico de actuar por parte del supuesto causante del daño, y (2) si de haberse realizado el acto omitido se hubiera evitado el daño. *Toro Aponte v. E.L.A., supra*; *Gladys Arroyo López y Otros v. E.L.A. et al.*, 126 DPR 682, 688 (1990).

Sin embargo, el deber de prever no se extiende a todo peligro imaginable que concebiblemente pueda amenazar la seguridad, sino que es aquel que llevaría a una persona prudente a anticiparlo. *S.L.G. Colón Rivas v. E.L.A.*, 196 DPR 855, 865 (2016); *Hernández v. Gobierno de la Capital*, 81 DPR 1031, 1038 (1960). La norma de previsibilidad consiste en "que el riesgo que debe preverse debe estar basado en probabilidades y no en meras posibilidades". *Cruz Flores v. Hospital Ryder Memorial, Inc., supra*, pág. 484. Salvo los casos expresamente mencionados en ley o por alguna obligación, "nadie responderá de aquellos sucesos que no hubieran podido preverse, o que, previstos, fueran inevitables". Artículo 1058 del Código Civil de 1930, *supra,* ant. sec. 3022. De igual modo, se debe examinar si un daño pudo ser el resultado natural y probable de un acto negligente, y si después del suceso, mirado retrospectivamente, tal daño aparece como la consecuencia razonable y ordinaria del acto que se alega fue negligente. *Cruz Flores v. Hospital Ryder Memorial, Inc., supra*, pág. 484.

En cuanto al daño, este se ha definido como "todo menoscabo material o moral causado contraviniendo una norma jurídica, que sufre una persona y del cual haya de responder otra". *López v. Porrata Doria, supra,* pág. 151 (*citando a* J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1983, T. 2, Vol. 3, pág. 92). De no existir daño o perjuicio, no existirá una

obligación de indemnizar. *López v. Porrata Doria, supra*, pág. 151 (*citando a Puig Brutau, op. cit.*, pág. 91). Por ello, es esencial que se demuestre la realidad de un daño y su cuantía. *López v. Porrata Doria, supra*, pág. 151 (*citando a Puig Brutau, op. cit.*, pág. 91).

Los daños se dividen en patrimoniales y no patrimoniales. *Sagardía De Jesús v. Hosp. Aux. Mutuo*, 177 DPR 484, 505 (2009). Los primeros consisten en el menoscabo valorable en dinero sobre el patrimonio del perjudicado. *Sagardía De Jesús v. Hosp. Aux. Mutuo, supra*, págs. 505-506. Por otro lado, los daños no patrimoniales "son en principio aquellos cuya valoración en dinero no tiene la base equivalencial que caracteriza a los patrimoniales, por afectar precisamente a elementos o intereses de difícil valoración pecuniaria". *Sagardía De Jesús v. Hosp. Aux. Mutuo, supra*, pág. 506 (*citando a* J. Santos Briz, *Tratado de Derecho Civil*, Barcelona, Ed. Bosch, 2003, T. III, pág. 457).

Bajo los daños no patrimoniales se encuentran los daños morales, los cuales se dividen en (1) los puros y (2) los morales impropios o patrimoniales indirectos. Los daños morales puros no producen repercusiones de carácter patrimonial; mientras que los daños morales impropios o patrimoniales indirectos transcienden valores del patrimonio. *Sagardía De Jesús v. Hosp. Aux. Mutuo, supra*, pág. 506. En general, los daños morales son "infligidos a las creencias, los sentimientos, la dignidad, la estima social o la salud física o psíquica del perjudicado", así como todo dolor físico o moral. *Sagardía De Jesús v. Hosp. Aux. Mutuo, supra*, pág. 506; *Rivera v. S.L.G. Díaz*, 165 DPR 408, 428 (2005). Además, son amplios y abarcan el dolor físico o corporal, las angustias mentales, hasta los daños o las lesiones corporales. *Sagardía De Jesús v. Hosp. Aux. Mutuo, supra*, págs. 506-507.

Una de las manifestaciones de la lesión corporal puede ser tanto el dolor físico como el psíquico. *Sagardía De Jesús v. Hosp.*

*Aux. Mutuo, supra.* El dolor físico es definido como "la manifestación a nivel local o general de la lesión, como consecuencia de los receptores nerviosos especializados en las distintas captaciones de estímulos". *Sagardía De Jesús v. Hosp. Aux. Mutuo, supra*, pág. 507 (*citando a* B. Pérez Pineda y M. García Blázquez, *Manual de valoración y baremación del daño corporal*, 4ta ed., Granada, Ed. Comares, 1995, pág. 36.). Es una sensación afectiva que se manifiesta de diversas formas incluyendo de forma perceptible, y por ello, el dolor físico es más fácil de constatar al estar relacionado con la lesión corporal que un dolor psíquico o las angustias mentales. *Sagardía De Jesús v. Hosp. Aux. Mutuo, supra*, págs. 507-508.

Por su parte, la angustia mental "es la reacción de la mente y de la consciencia a un daño corporal o un evento sufrido y su impacto subjetivo en el bienestar personal". *Sagardía De Jesús v. Hosp. Aux. Mutuo, supra*, pág. 508; A.J. Amadeo-Murga, *El valor de los daños en la responsabilidad civil*, San Juan, Ed. Esmaco, 1997, T. I, pág. 223. Por lo tanto, no siempre guarda relación con un daño corporal.

Ahora bien, además de la existencia de un daño real y un acto culposo o negligente, es esencial la existencia de un nexo causal para apoyar una reclamación en concepto de daños y perjuicios. La doctrina de causalidad dicta que "no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general". *Nieves Díaz v. González Massas*, 178 DPR 820, 844 (2010) (*citando a Sociedad de Gananciales v. Jerónimo Corp.*, 103 DPR 127, 134 (1974)). Este elemento es imprescindible en una causa de acción de daños y perjuicios, pues vincula al daño directamente con el hecho antijurídico. *Nieves Díaz v. González Massas, supra*, págs. 844-845. Además, el nexo causal está íntimamente ligado con la previsibilidad. *Nieves Díaz v. González Massas, supra*, pág. 844. El

deber de cuidado incluye la obligación de anticipar y el de evitar la ocurrencia de los daños, cuya probabilidad es razonablemente previsible. *Administrador v. ANR*, 163 DPR 48, 60 (2004).

## C.

En Puerto Rico, la responsabilidad civil extracontractual por impericia médica tradicionalmente se impone por la culpa o negligencia de un facultativo médico, conforme al Artículo 1802 del Código Civil de 1930, *supra*, ant. sec. 5141. Ese raciocinio surge "de la norma mínima de cuidado médico exigible a la luz de los modernos medios de comunicación y enseñanza, y conforme al estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina, que satisfacen las exigencias generalmente reconocidas por la profesión". *Cruz Flores v. Hospital Ryder Memorial, Inc., supra*, pág. 487 (Énfasis suplido en el original eliminado); *López v. Dr. Cañizares*, 163 DPR 119, 133 (2004). El Tribunal Supremo de Puerto Rico ha sostenido que existe una presunción rebatible, en casos de responsabilidad profesional médica, al efecto de que el médico ha ejercitado un grado razonable de cuidado y de que la administración del tratamiento al paciente ha sido adecuada. Corresponde al demandante presentar evidencia suficiente para controvertir esta presunción y para ello la prueba debe demostrar algo más que una mera posibilidad de que el daño se debió al incumplimiento por parte del médico de su obligación profesional. *Reyes v. Phoenix Assurance Co.*, 100 DPR 871, 876 (1972). El hecho de que un paciente haya sufrido un daño o que el tratamiento no haya sido exitoso no produce ninguna presunción de negligencia por parte del médico. Para rebatir esta presunción, la demandante no puede descansar en una mera posibilidad de que el daño se debió al incumplimiento del médico con su obligación profesional. Lo anterior requiere que la relación de causalidad no se establezca a base de una mera especulación o conjetura. *Ramos, Escobales v. García González*, 134 DPR 969, 976

(1993). Igualmente, "[s]i la evidencia señala más de una causa probable del daño, no puede imponérsele responsabilidad a éste a menos que del conjunto de la prueba surja que la actuación negligente atribuida a éste es la que con mayores probabilidades la causó". *Reyes v. Phoenix Assurance Co., supra*, pág. 876; *Rivera v. E.L.A.*, 99 DPR 890, 898-899 (1971).

En esa misma línea, el demandante debe establecer por medio de prueba pericial cuáles son los requerimientos de cuidado y conocimiento científicos requeridos por la profesión médica en el tratamiento de sus pacientes. *López v. Dr. Cañizares, supra*, pág. 133. Una vez demostrado cuáles son dichas normas mínimas aplicables a la controversia de marras, el demandante debe probar que el demandado incumplió con esas normas en el tratamiento del paciente y que ello fue lo que causó la lesión sufrida. *López v. Dr. Cañizares, supra*, págs. 133-134; *Medina Santiago v. Vélez*, 120 DPR 380, 385 (1988). De esta forma, " '[n]uestro ordenamiento obliga al médico a responder por los daños y perjuicios causados *tan sólo* cuando actúa negligentemente, con descuido o falta de la pericia profesional que exigen las circunstancias' ". *López v. Dr. Cañizares, supra*, pág. 134 (*citando a Ríos Ruiz v. Mark*, 119 DPR 816, 820 (1987)). Al médico se le reconoce una latitud amplia en su discreción al momento de formular su juicio profesional en cuanto al diagnóstico y tratamiento médico. *Ramos, Escobales v. García González, supra*, pág. 975. Igualmente, nuestro máximo foro ha rechazado imponerle responsabilidad al médico, cuando este ha utilizado su buen juicio profesional y el mismo es cónsono con lo razonablemente aceptado por muchos sectores de la profesión médica. *Ramos, Escobales v. García González, supra*, pág. 975. Asimismo, "el error de juicio --*honesto e informado*-- cometido por un médico en el tratamiento de su paciente no constituye fuente de responsabilidad". *Pérez Torres v. Bladuell Ramos*, 120 DPR 295, 304 (1941). "Lo que constituye una práctica

profesional adecuada se determina generalmente a través del testimonio de los expertos médicos". *Reyes v. Phoenix Assurance Co., supra,* pág. 877.

**III.**

En el caso de marras nos toca determinar si el TPI les dirimió credibilidad a los peritos y a las partes de forma sumaria, y si se excedió en su discreción al realizar determinaciones de hechos que no estaban relacionadas a las controversias esbozadas en la solicitud de sentencia sumaria y su oposición. Además, debemos determinar si existen hechos en controversia y si procedía declarar Ha Lugar la solicitud de sentencia sumaria del Dr. Bravo Martínez.

A juicio del TPI, procedía dictar una sentencia parcial sumaria y consecuentemente, desestimar la demanda en contra del Dr. Bravo Martínez. El TPI fundamentó su determinación en que el Dr. Bravo Martínez no se apartó de las normas de excelencia profesional reconocidas por la profesión médica, y que no existía un nexo causal entre el diagnóstico abdominal del Dr. Bravo Martínez y los daños sufridos por la Sra. Santos Rosario.

Inconforme, la parte apelante sostuvo que la petición de sentencia sumaria era improcedente, ya que existían hechos en controversia; estos eran, si el Dr. Bravo Martínez incurrió en negligencia al no haber mencionado en la lectura del CT Scan el diagnóstico de pseudoquiste pancreático, y si la prueba pericial de la parte apelante sustentaba las alegaciones de negligencia en contra del Dr. Bravo Martínez. La parte apelante también adujo que el TPI erró al dirimir la credibilidad de los peritos y las partes, y al realizar determinaciones de hechos y conclusiones de derecho que no estaban relacionadas a la solicitud de sentencia sumaria y la oposición a esta.

Por su parte, la parte apelada arguyó que la parte apelante pretendió rotular como credibilidad lo que en realidad fue una

insuficiencia probatoria. Sostuvo también que, al considerar una solicitud de sentencia sumaria, los jueces y las juezas pueden y deben considerar todos los documentos en autos, sean o no parte de dicha petición y su oposición, de los cuales surjan las admisiones de las partes. Por último, adujo que el foro *a quo* resolvió conforme a la Regla 36 de Procedimiento Civil, *supra*, y jurisprudencia aplicable, y suplicó que confirmáramos la *Sentencia Parcial* apelada.

Tras un análisis objetivo y cuidadoso, resolvemos que el foro primario no incidió en los señalamientos de error planteados por la parte apelante.

Como pormenorizamos anteriormente, según *Meléndez González et al. v. M. Cuebas*, *supra*, el primer paso del estándar de revisión de las solicitudes de sentencia sumaria es revisar el expediente *de novo* de la forma más favorable para la parte que se opuso a la solicitud de sentencia sumaria, y aplicar los mismos criterios de la Regla 36 de Procedimiento Civil, *supra*. De igual modo, el segundo pilar exige que revisemos que tanto la petición de sentencia sumaria como su oposición cumplan con los requisitos de la Regla 36 de Procedimiento Civil, *supra*. *Meléndez González et al. v. M. Cuebas, supra*, pág. 118. En el presente caso, la *Moción de Sentencia Sumaria por Falta de Relación Causal* presentada por la parte apelada cumplió con los requisitos de forma del inciso (a) de la Regla 36.3 de Procedimiento Civil, *supra*, pues indicó que no existían asuntos en controversia; expuso la reclamación respecto a la cual fue solicitada la sentencia sumaria; incluyó una relación concisa, organizada y en párrafos enumerados de los hechos materiales sobre los cuales no había controversia sustancial, con indicación de la prueba documental; las razones por las que debería dictarse la sentencia argumentando el derecho aplicable; y el remedio que debía ser concedido. De igual modo, la *Oposición a Sentencia Sumaria por Falta de Relación Causal* radicada por la parte

apelante cumplió con los requerimientos del inciso (b) de la Regla 36.3 de Procedimiento Civil, *supra*; a saber, incorporó una exposición breve de las alegaciones de las partes; los asuntos en controversia; la causa de acción respecto a la cual se solicitó la sentencia sumaria; una enumeración de los hechos que no estaban en controversia, con referencia a prueba documental; los hechos que estaban controvertidos; y las razones por las que no debía ser dictada la sentencia.

Habiéndose cumplido con los primeros dos eslabones del análisis apelativo sobre las solicitudes de sentencia sumaria, debemos evaluar como tercer paso si en realidad existen hechos materiales en controversia. De haberlos, debemos cumplir con la exigencia establecida en la Regla 36.4 de Procedimiento Civil, *supra*, y exponer cuáles son los hechos materiales que están en controversia y cuáles están incontrovertidos.

Del expediente del caso se desprende que las determinaciones de hechos formuladas por el TPI surgen incontrovertidamente del récord. Recuérdese que, "la parte opositora tiene el peso de presentar evidencia sustancial que apoye los hechos materiales que alega están en disputa". *León Torres v. Rivera Lebrón, supra,* pág. 44. De esta forma, dicha parte <u>no puede descansar en meras aseveraciones o negaciones de sus alegaciones</u>, sino que debe proveer contradeclaraciones juradas y documentos que sustenten los hechos materiales en disputa. *SLG Zapata-Rivera v. JF Montalvo,* supra; *Ramos Pérez v. Univisión, supra,* pág. 215; *Cruz Marcano v. Sánchez Tarazona, supra,* pág. 550.

En el presente caso, la parte apelante sostuvo que, el Dr. Bravo Martínez testificó que le había pasado por la mente un posible diagnóstico de pseudoquiste, al ver la colección de fluidos en

una cavidad postquirúrgica, pero no lo incluyó como diagnóstico.[14] Así, la parte apelante adujo que del Dr. Bravo Martínez haber incluido en la lectura del CT Scan el diagnóstico diferencial pancreático, se hubiese alertado sobre posibles tratamientos adicionales para la Sra. Santos Rosario y se hubiese descartado el drenaje. Además, sostuvo que dicha lectura fue lo que con mayor probabilidad ocasionó el perjuicio reclamado, ya que- tomando en consideración solamente la lectura del CT realizada por el Dr. Bravo Martínez el 13 de noviembre de 2020- llevó a los demás médicos a errar en la toma de decisiones en cuanto al tratamiento adecuado para la Sra. Santos Rosario.

Ciertamente, concluir que el Dr. Bravo Martínez fue negligente porque testificó que le había pasado por la mente un posible diagnóstico de pseudoquiste, y meramente argüir que el Dr. Bravo Martínez llevó a los demás médicos a errar en la toma de decisiones en cuanto al tratamiento adecuado para la Sra. Santos Rosario sin prueba para apoyarlo, no era suficiente para establecer que existía controversia sobre esa aseveración. En cambio, la parte apelada presentó la deposición del Dr. Rivera Velázquez, quien testificó que, luego de evaluar las imágenes del CT, examinaba las lecturas para ver si estaba de acuerdo con el diagnóstico realizado por otra persona. Sostuvo que ese era el proceso que seguía "para no estar predispuesto a algo, si no que evalúo las imágenes para ver qué es lo que veo ahí, y entonces veo la lectura para ver si estoy de acuerdo con lo que dijeron en la lectura, o si encuentro algo adicional o si sería eso".[15] Respecto al caso de marras, el Dr. Rivera Velázquez indicó que, posterior a evaluar el periodo de tiempo de la cirugía de la paciente y las imágenes del CT, no alcanzó otro diagnóstico

---

[14] *Íd.*, Anejo 7, pág. 34, L 10-23.
[15] *Íd.*, Anejo 6, pág. 132, L 4-8.

porque "claramente era un absceso".[16] En esa misma línea, el Dr. Manuel R. Pérez González, perito del Dr. Rivera Velázquez, expresó en su deposición que el radiólogo intervencional -en este caso, el Dr. Rivera Velázquez- no tenía que estar de acuerdo con el diagnóstico emitido por el radiólogo diagnóstico-el Dr. Bravo Martínez-.[17]

Ante todo lo anterior, no existe duda de que la parte apelante no logró controvertir que el Dr. Rivera Velázquez aceptó haber realizado un examen independiente de las imágenes del CT con el propósito de no estar predispuesto y, aun así llegó al mismo diagnóstico de la presencia de un absceso. En su consecuencia, no es meritoria la alegación de la parte apelante de que la lectura del CT realizada por el Dr. Bravo Martínez el 13 de noviembre de 2020 fue lo que, con mayor probabilidad, ocasionó el perjuicio reclamado, y llevó a los demás médicos a errar en la toma de decisiones en cuanto al tratamiento adecuado para la Sra. Santos Rosario. Por ende, el TPI no incidió al determinar que no existían hechos materiales en controversia.

No existiendo hechos en controversia, pasamos al cuarto y último eslabón; es decir, debemos revisar de *novo* si el TPI aplicó correctamente el derecho. *Meléndez González et al. v. M. Cuebas*, *supra*, pág. 119.

Por un lado, la parte apelante sostuvo que el foro primario incidió al no resolver la moción de sentencia sumaria de la forma más favorable para esta. No le asiste razón.

Como señalamos anteriormente, el Tribunal Supremo de Puerto Rico ha sostenido que existe una presunción rebatible, en casos de responsabilidad profesional médica, al efecto de que el médico ha ejercitado un grado razonable de cuidado y de que la administración

---

[16] *Íd.*, L 12-16.
[17] *Íd.*, pág. 136, L 2-24.

del tratamiento al paciente ha sido adecuada. Corresponde al demandante presentar evidencia suficiente para controvertir esta presunción y para ello la prueba debe demostrar algo más que una mera posibilidad de que el daño se debió al incumplimiento por parte del médico de su obligación profesional. *Reyes v. Phoenix Assurance Co., supra,* pág. 876. El hecho de que un paciente haya sufrido un daño o que el tratamiento no haya sido exitoso <u>no produce ninguna presunción de negligencia por parte del médico. Para rebatir esta presunción, la demandante no puede descansar en una mera posibilidad de que el daño se debió al incumplimiento del médico con su obligación profesional. Lo anterior requiere que la relación de causalidad no se establezca a base de una mera especulación o conjetura.</u> *Ramos, Escobales v. García González, supra,* pág. 976. Igualmente, "[s]i la evidencia señala más de una causa probable del daño, no puede imponérsele responsabilidad a éste a menos que del conjunto de la prueba surja que la actuación negligente atribuida a éste es la que con mayores probabilidades la causó". *Reyes v. Phoenix Assurance Co., supra,* pág. 876; *Rivera v. E.L.A., supra,* págs. 898-899.

Asimismo, al médico se le reconoce una latitud amplia en su discreción al momento de formular su juicio profesional en cuanto al diagnóstico y tratamiento médico. *Ramos, Escobales v. García González, supra,* pág. 975. Nuestro máximo foro ha rechazado imponerle responsabilidad al médico, cuando este ha utilizado su buen juicio profesional y el mismo es cónsono con lo razonablemente aceptado por muchos sectores de la profesión médica. *Ramos, Escobales v. García González, supra,* pág. 975. "[E]l error de juicio -- *honesto e informado*-- cometido por un médico en el tratamiento de su paciente no constituye fuente de responsabilidad". *Pérez Torres v. Bladuell Ramos, supra,* pág. 304. "Lo que constituye una práctica profesional adecuada se determina generalmente a través del

testimonio de los expertos médicos". *Reyes v. Phoenix Assurance Co.,* *supra,* pág. 877.

En el presente caso, el perito de la parte apelante, el Dr. Shaun L. Samuels (Dr. Samuels), expuso que la única alegación en contra del Dr. Bravo Martínez era que, a base de la lectura del CT Scan realizada por dicho médico el 13 de noviembre de 2020, el Dr. Bravo Martínez no incluyó la probabilidad de un pseudoquiste.[18] Lo anterior, cuando los cambios postoperatorios de la Sra. Santos Rosario, tales como la acumulación de fluido y otros, apuntaban a un desarrollo de un pseudoquiste pancreático.[19] Utilizando la fecha del procedimiento quirúrgico; es decir, el 14 de octubre de 2020, y la fecha en la que el Dr. Bravo Martínez realizó la lectura de CT-el 13 de noviembre de 2020-, el Dr. Samuels determinó que ese era el tiempo que usualmente tardaba un pseudoquiste en formarse.[20] Opinó que, al no incluirse la probabilidad del pseudoquiste, se tomó la decisión de intentar el drenaje.[21] El Dr. Samuels testificó que el drenaje se debía evitar, <u>al menos que hubiese evidencia convincente de una infección</u>,[22] y que, según él, no estaba infectado.[23]

El Dr. Samuels estableció que típicamente el curso de acción correcto ante un caso de absceso abdominal sería realizar un CT abdominal con contraste; y sostuvo que, típicamente, el tratamiento para un absceso abdominal sería un drenaje. También afirmó que el drenaje podía ser insertado por un radiólogo intervencional, y esbozó que de un absceso drenarse este podría contener pus.[24] Afirmó que típicamente un pseudoquiste podía ocurrir, luego de cuatro (4) semanas de un evento agudo como una pancreatitis, trauma o

---

[18] *Íd.,* Anejo 7, págs. 330, L 16-24; 331, L 1-6.
[19] *Íd.,* págs. 331-333, 356-358.
[20] *Íd.,* pág. 367, L 10-16.
[21] *Íd.,* pág. 294, L 6-10.
[22] *Íd.,* págs. 347, L 21-24; 348, L 1-2.
[23] *Íd.,* pág. 355, L 14-17.
[24] *Íd.,* págs. 379, L 12-24; 380, L 1-20.

cirugía,[25] y que personas con un pseudoquiste presentaban en ocasiones una serie de síntomas incluyendo el dolor abdominal, la anorexia, náuseas, vómitos y dolor abdominal.[26] El Dr. Samuels sostuvo que de ella haber sufrido de una infección ocasionada por este organismo, hubiese padecido de fiebre alta, contaje alto de glóbulos blancos, apariencia tóxica, sudor, escalofríos, náuseas, anorexia y dolor abdominal.[27]

Con relación a los hechos materiales del caso, el 13 de noviembre de 2020, el Dr. Bravo Martínez realizó varias evaluaciones médicas incluyendo la lectura de un CT Scan, y determinó que había un absceso. Ulteriormente, le hicieron una consulta al Dr. Rivera Velázquez, ya que existía una sospecha de un absceso intrabdominal, y si el absceso debía o no drenarse.[28] Ante lo anterior, el Dr. Rivera Velázquez intervino con la paciente, y luego de realizar un estudio independiente de las imágenes del CT Scan, estuvo de acuerdo con que había un absceso.[29] El Dr. Rivera Velázquez expresó que la Sra. Santos Rosario "tenía los blancos elevados y todo eso, o sea, que tenía predominancia de neutrófilo así que, eso indica que tenía una infección bacteriana en algún sitio".[30] Terminada la intervención, el Dr. Rivera Velázquez envió una muestra del líquido recolectado por el drenaje para cultivar, e identificó que creció la bacteria *Pseudomonas aeruginosa*.[31] Tanto el Dr. Pérez-perito del Dr. Rivera Velázquez- como el Dr. Francisco De la Cruz Cruz (Dr. De la Cruz)-perito de PRMDIC y del Dr. Bravo Martínez- coincidieron en que un pseudoquiste infectado se llamaba

---

[25] *Íd.*, pág. 365, L 14-21.
[26] *Íd.*, pág. 383.
[27] *Íd.*, págs. 386-388.
[28] *Íd.*, pág. 458, L 16-21.
[29] *Íd.*, pág. 461, L 1-11.
[30] *Íd.*, pág. 465, L 1-3.
[31] *Íd.*, pág. 470, L 14-25.

absceso, y que de la muestra extraída de la Sra. Santos Rosario creció la bacteria *Pseudomonas aeruginosa.*[32]

A tenor con todo lo anterior, la parte apelada logró demostrar que la Sra. Santos Rosario tenía una infección. En su consecuencia, el diagnóstico de absceso realizado por el Dr. Bravo Martínez fue conforme a las normas de excelencia profesional reconocidas por la profesión médica. Adviértase también que el Dr. Bravo Martínez poseía amplia discreción para exponer juicio profesional respecto al diagnóstico y tratamiento. *Ramos, Escobales v. García González, supra*, pág. 975.

Por otro lado, la parte apelante tampoco demostró la existencia de un nexo causal.

Para iniciar una causa de acción, a tenor con el Artículo 1802 del Código Civil de 1930, *supra*, ant. sec. 5141, la parte demandante debe establecer tres (3) requisitos; a saber, (1) la existencia de un daño real; (2) el nexo causal entre el daño y la acción u omisión de la parte demandada; y (3) el que el acto u omisión sea culposo o negligente. *Cruz Flores v. Hospital Ryder Memorial, Inc., supra*, págs. 483-484; *Pérez Hernández v. Lares Medical Center, Inc., supra*, pág. 976; *López v. Porrata Doria, supra*, pág. 150. En lo pertinente, la doctrina de causalidad dicta que "no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general". *Nieves Díaz v. González Massas, supra*, pág. 844 (*citando a Sociedad de Gananciales v. Jerónimo Corp., supra*, pág. 134). Este elemento es imprescindible en una causa de acción de daños y perjuicios, pues vincula al daño directamente con el hecho antijurídico. *Nieves Díaz v. González Massas, supra*, págs. 844-845. Además, el nexo causal está íntimamente ligado con la previsibilidad. *Nieves Díaz v.*

---

[32] *Íd.*, págs. 521, L 3-4; 637, L 12-25; 638, L 1-13.

*González Massas, supra,* pág. 844. La norma de previsibilidad "es que el riesgo que debe preverse debe estar basado en probabilidades y no en meras posibilidades". *Cruz Flores v. Hospital Ryder Memorial, Inc., supra,* pág. 484. Asimismo, salvo los casos expresamente mencionados en ley o por alguna obligación, "nadie responderá de aquellos sucesos que no hubieran podido preverse, o que, previstos, fueran inevitables". Artículo 1058 del Código Civil de 1930, *supra,* ant. sec. 3022 (derogado).

El deber de cuidado incluye la obligación de anticipar y el de evitar la ocurrencia de los daños, cuya probabilidad es razonablemente previsible. *Administrador v. ANR, supra,* pág. 60. Sin embargo, el deber de prever no se extiende a todo peligro imaginable que concebiblemente pueda amenazar la seguridad, sino que es aquel que llevaría a una persona prudente a anticiparlo. *S.L.G. Colón Rivas v. E.L.A., supra,* pág. 865; *Hernández v. Gobierno de la Capital, supra,* pág. 1038. De igual modo, se debe examinar si un daño pudo ser el resultado natural y probable de un acto negligente, y si después del suceso, mirado retrospectivamente, tal daño aparece como la consecuencia razonable y ordinaria del acto que se alega fue negligente. *Cruz Flores v. Hospital Ryder Memorial, Inc., supra,* pág. 484 (Énfasis suplido en el original eliminado).

Del expediente surge que un segundo radiólogo examinó las imágenes del CT; siendo este, el Dr. Rivera Velázquez. Este doctor testificó que, con el propósito de no estar predispuesto, observó las imágenes del CT primero, pero, aun así, coincidió con el Dr. Bravo Martínez en cuanto a que la Sra. Santos Rosario tenía un absceso. Es decir, el Dr. Rivera Velázquez no estaba obligado por el diagnóstico alcanzado por el Dr. Bravo Martínez, empero determinó lo mismo. Más importante aún, las funciones del Dr. Bravo Martínez eran de radiólogo diagnóstico y no de un médico a cargo. En otras palabras, el Dr. Bravo Martínez no tuvo inherencia alguna sobre los

tratamientos que determinaron los doctores que atendieron posteriormente a la Sra. Santos Rosario. Por lo tanto, el que el Dr. Bravo Martínez omitiera la posibilidad de un pseudoquiste en su lectura, ciertamente, no fue la causa natural y directa de los daños reclamados por la parte apelante. En su consecuencia, el foro primario tampoco erró al declarar Ha Lugar la solicitud de sentencia sumaria de la parte apelada.

Por último, la parte apelante sostuvo que el TPI erró al dirimir la credibilidad de los peritos de las partes y de los médicos de forma sumaria, y al otorgarle mayor credibilidad al testimonio de los peritos brindados en las deposiciones. Además, adujo que el TPI erró y actuó con perjuicio y parcialidad al realizar determinaciones de hechos que no estaban relacionadas a la controversia esbozada en la solicitud de sentencia sumaria y su oposición.

Según descrito anteriormente, nuestro máximo foro ha establecido que no es aconsejable dictar una sentencia sumaria cuando existe controversia sobre asuntos de credibilidad o que envuelvan aspectos subjetivos tales como la intención, los propósitos mentales o la negligencia. *Aponte Valentín v. Pfizer Pharmaceuticals, LLC, supra,* pág. 278. Sin embargo, "nada impide que se utilice el mecanismo de sentencia sumaria en reclamaciones que requieran elementos subjetivos o de intención cuando surge de los documentos que se considerarán en la solicitud de sentencia sumaria la inexistencia de una controversia en torno a los hechos materiales". *Cruz Cruz v. Casa Bella Corp., supra,* pág. 993 (Énfasis suplido). Asimismo, una de las piezas probatorias que se utilizan para determinar que no existen hechos en controversia es la deposición. Regla 36.3(e) de Procedimiento Civil, *supra,* R. 36.3(e). Además, al evaluar una moción de sentencia sumaria, "los jueces no están limitados por los hechos o documentos que se aduzcan en la solicitud, sino que deben considerar todos los documentos en

autos —sean o no parte de la solicitud de sentencia sumaria— de los cuales surjan admisiones hechas por las partes". *Mejías v. Carrasquillo, supra,* pág. 300.

En el presente caso, aunque la reclamación de daños y perjuicios por impericia médica requería de elementos subjetivos, tales como la negligencia, la parte apelante falló en presentar prueba suficiente para rebatir los hechos y la evidencia propuesta en la solicitud de sentencia sumaria. Es decir, la parte apelante falló en evidenciar que el Dr. Bravo Martínez fue negligente al omitir del diagnóstico un posible pseudoquiste, y que ello fue la causa directa y natural de los daños reclamados. Ciertamente, el TPI no estaba limitado por los hechos ni los documentos de la solicitud de sentencia sumaria y la oposición para determinar si concedía la petición sumaria. Además, y, contrario a lo planteado por la parte apelante, el foro primario realizó determinaciones de hechos *materiales,* pues los testimonios de los peritos y de las partes afectaban el resultado de la antedicha reclamación. *Ramos Pérez v. Univisión, supra,* pág. 213. Por ende, el TPI tampoco erró al utilizar resolver el pleito de marras sumariamente, y al realizar determinaciones de hechos y conclusiones de derecho tomando en cuenta las deposiciones de las partes y los peritos.

**IV.**

Por las razones discutidas anteriormente, confirmamos la *Sentencia Parcial* apelada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones